S98A1738. BUTLER v. THE STATE.
S98A1739. LANGSTON v. THE STATE.
S98A1742. WHITE v. THE STATE.
(511 SE2d 180)

SEARS, Justice.

Arthur Butler, Antonio Langston, and Demetrius White were jointly indicted and tried for numerous crimes stemming from the shooting death of Donnie Cantrell. They now appeal from their various convictions and sentences.[1] On appeal, they raise numerous issues, including that the trial court erred in failing to sever their trials, that the trial court should have granted them new trials based upon juror misconduct, and that the trial court erred in admitting into evidence a statement that Langston gave to police before trial. We conclude, however, that the issues raised by the appellants are without merit, and we therefore affirm their convictions.

The evidence introduced at trial showed that on April 19, 1996,

---

[1] The crimes occurred on April 19, 1996. Butler, Langston, and White were indicted on May 3, 1996, and were jointly tried from April 8 to April 22, 1997. The jury returned its verdicts on April 22, and the trial court sentenced all three defendants that same day. Butler, Langston, and White were all found guilty of felony murder (with aggravated assault and armed robbery being the underlying felonies), three counts of aggravated assault with intent to rob, three counts of aggravated assault with a deadly weapon, and three counts of armed robbery. White was also found guilty of felony murder during the commission of the offense of possession of a firearm by a convicted felon, and of the offense of possession of a firearm by a convicted felon. The trial court ruled that the various aggravated assault counts merged with either the felony murder or armed robbery convictions for sentencing. The trial court sentenced Butler, Langston, and White to life in prison for the felony murder convictions that were predicated upon the aggravated assaults, and to three consecutive terms of twenty years in prison for armed robbery. The court did not sentence White for the felony murder conviction that was based upon the underlying felony of possession of a firearm by a convicted felon, but did sentence White to a consecutive term of five years in prison for the conviction on the possession offense. Butler, Langston, and White filed motions for new trial on May 20, May 1, and May 19, 1997, respectively. Butler and White both filed amended motions for new trial on January 8, 1998. The court reporter certified the trial transcript on July 31 and August 12, 1997. The trial court denied the motions for new trial, as amended, on March 26, 1998. Butler, Langston, and White filed their notices of appeal on April 13, April 21, and April 23, 1998, respectively. The appeals were all docketed in this court on July 30, 1998, and were all submitted for decision on briefs on September 21, 1998.

the victims, Ronald Murray, Jethro Richardson, and Donnie Cantrell traveled to Atlanta from Akron, Ohio. The three men were traveling in a black Cadillac driven by Murray. After arriving in Atlanta and visiting a night club that evening, they got lost and eventually stopped at a traffic light at the intersection of Memorial Drive and Connally Street in Southeast Atlanta. While at the traffic light, the three men noticed Shemika Branham, Renee Alexander, and Sherita Cotton standing on the corner of Memorial Drive near a phone booth. The men parked their car at the curb on Connally Street near the phone booth to talk with the women. Renee Alexander stood at the driver's window talking with Ronald Murray, Shemika Branham stood at the front passenger's window speaking to Jethro Richardson, and Sherita Cotton stood at the right rear passenger's window talking with Donnie Cantrell.

Meanwhile, according to witness Rodney Crumbley, a group of men standing under a tree near an apartment building on Memorial Drive had been observing the Cadillac. The group was across the street from the Cadillac. Crumbley testified that the group included appellants White, Langston (who had his hair braided), and Butler, as well as co-defendant Gregory Smith and an individual identified only as "Man." Crumbley added that all the people in the group made comments indicating an intent to rob the men in the Cadillac, but that White was the first person to raise the idea. Crumbley also stated that White, Langston, and Butler all said they were armed. Crumbley testified that "Man" suggested that the group could walk toward a nearby Amoco station, and then "get them [the people in the Cadillac] coming back." According to Crumbley, White, Langston, Butler, Smith, and "Man" then walked toward the Amoco station and then back toward the Cadillac. Shemika Branham observed White, Langston, Butler, and Smith walk past the Cadillac several times, and testified that the last time that the group walked by, Smith was not with the others. Another witness, Patient McClarin, testified that she observed the young women talking to the men in the Cadillac, and she saw the group of men under the tree. McClarin also stated that she saw White, Langston, Butler, Smith and an unidentified male cross the street toward the Cadillac.

Ronald Murray and Jethro Richardson testified that as the three men in the car ended their conversation with the three young women, three armed men approached the Cadillac, with one pointing a gun at Cantrell in the right rear passenger seat, one pointing a gun at Richardson in the front passenger seat, and one pointing a gun at Murray in the driver's seat. Shemika Branham, Sherita Cotton, Ronald Murray, and Jethro Richardson heard the man at the driver's side order the men in the car to empty their pockets. Murray testified that Richardson, Cantrell, and he gave the gunmen the money that

they had. He added that he could not identify the two gunmen who were on the passenger side of the car, but that the gunman pointing a gun at him had braids in his hair. Shemika Branham and Sherita Cotton identified Langston as the gunman at the driver's window, but they also testified that they did not see gunmen at the passenger side windows. Shemika Branham added that when she saw Langston pointing a gun at the driver, she turned to run, and that as she did so, she saw White coming through a fence next to a nearby apartment building. In an attempt to escape the robbery, Ronald Murray backed the car away from the curb. The armed men began shooting at the car, fatally wounding Donnie Cantrell.

Rodney Crumbley testified that he saw Langston later that night and that Langston told him that he (Langston) thought that White had killed someone. On April 20, 1996, the police arrested White at his girlfriend's residence. Upon searching the residence, the police found a partially empty box of Remington .380 caliber ammunition. The police also found six shell casings at the scene of the robbery that were determined to be Remington .380 caliber casings.

Butler, Langston, White, and Smith were jointly indicted and tried for the crimes. Smith called McKesia Trent as a witness. Trent testified that she lived right across the street from Smith's sister, and that when she stands on her porch and looks across the street she can see in the apartment of Smith's sister. She testified that on the evening of the crime, she went onto her porch and looked across the street and saw Smith and Butler standing near the door to Smith's sister's apartment. At about that same time, she saw shots being fired at the Cadillac.

As previously stated in this opinion, Butler, Langston, and White were all convicted of various offenses, including felony murder. Smith, however, was acquitted of all charges.

1. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found Butler, Langston, and White guilty beyond a reasonable doubt of the crimes for which they were convicted.[2]

2. Butler, Langston, and White all contend that the trial court erred in failing to grant their motions for a new trial based upon juror misconduct. For the reasons that follow, we disagree.

At the hearing on the motions for new trial, juror Farah Carter was asked whether she knew if any jurors had gone to the scene of the crime at some point during the trial and reported what they saw to the jury. She responded that she did not know whether any jurors had gone to the scene during trial or whether they had been by the

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

scene before trial, but she added that while the jurors were trying to determine the distance between some of the objects at the scene when examining a photo or sketch of the scene, one juror made a statement that she had been at the scene and knew about the distances. She could not recall whether the juror related any specific fact about the distances to the other jurors, and she stated that nothing that happened in this regard contributed to her verdict.

Suparna Malempati, who represented Smith at trial, testified that she spoke with Carter several weeks after trial, and that Carter told her that a couple of the jurors had been to the scene and told other jurors that the distance from the place of the shooting to the apartment of Smith's sister was not far.

When another juror, Gladys Waters, was asked whether she recalled any jurors stating that they had gone to the crime scene during deliberations, she responded that she vaguely remembered that occurring. She could not remember specifically what they mentioned about the crime scene, but she stated that generally they said that the distances at the crime scene were not what they "looked like on the picture." She could not recall the names of jurors who had been to the crime scene. Also, although she stated first that she was not sure if the information had had an impact on her verdict, she then added that it was possible that the information had had an impact. The only other juror to testify stated that she did not remember any jurors stating that they had been to the crime scene; that she recalled reviewing the crime scene photographs and diagrams; and that she did not recall any extrajudicial information that contributed to the verdict.

Jurors generally are not permitted to impeach their verdict,[3] but this rule "does yield to a defendant's constitutional guarantees. Whether or not [an] exception should be made must be determined by the circumstances of the case."[4] To set aside a jury verdict solely because of irregular jury conduct, this Court must conclude that the conduct was so prejudicial that the verdict is inherently lacking in due process.[5] In *Bobo*, in which we reversed the conviction because two jurors visited the crime scene and provided information to the jury, it was

> undisputed that [the] two jurors affirmatively sought to sway their fellow jurors' votes by relating personal observations and opinions concerning facts and circumstances sur-

---

[3] OCGA § 17-9-41.

[4] *Oliver v. State*, 265 Ga. 653, 654-655 (461 SE2d 222) (1995) (citation omitted).

[5] *Bobo v. State*, 254 Ga. 146 (1) (327 SE2d 208) (1985); *Sims v. State*, 266 Ga. 417, 419 (467 SE2d 574) (1996); *Holcomb v. State*, 268 Ga. 100, 103 (485 SE2d 192) (1997).

rounding the crime which were critical to determining the credibility of the sole eyewitness' identification. Moreover, there is some evidence that their statements had the desired effect, since two other jurors testified that the vote shifted in favor of conviction after the improper evidence was introduced into the deliberations, and one of those two indicated the evidence had influenced his vote.[6]

Here, in contrast, even if we assume that one or more jurors related personal knowledge of the crime scene to the jury, there is no evidence regarding exactly what that information was or how it related to the jury's deliberations regarding any particular defendant. Moreover, there was no evidence that the jurors who allegedly provided this extrajudicial information attempted to sway other jurors with the information. Furthermore, two witnesses said that such information did not contribute to the verdict, and one juror merely raised the possibility that the information might have contributed to her verdict, but this was only after stating that she was not sure it had had an impact on her verdict. For these reasons, we conclude that the alleged irregular conduct was not so prejudicial as to have rendered the trial fundamentally unfair and to have contributed to the conviction.[7]

3. Next, we address Butler's contention that the trial court erred in admitting Langston's custodial statement into evidence. Butler contends that admitting the statement into evidence violated Butler's right to cross-examination secured by the Confrontation Clause of the Sixth Amendment. We conclude, however, that admitting Langston's statement into evidence did not violate Butler's right of confrontation.

In Langston's statement, he described the activities of himself and six other people. The names of the six other people were redacted, and the letters A-F were substituted. He stated that he and A, B, C, and D saw the three girls talking to three guys in a Cadillac, and that A and D talked about robbing the guys in the Cadillac. He said that B and C were there when A and D raised this question, and that all of them walked over to the Cadillac. According to Langston, A had a .380 caliber handgun and D had a .38 caliber handgun. Langston stated that A and D pointed their pistols at the guys in the Cadillac and demanded their money. He added that the guys in the Cadillac gave A and D some money; that the Cadillac then drove off; and that A and D started shooting. Langston stated that he then ran to E's house. He also stated that A got his pistol from F, who was A's

---

[6] *Bobo*, 254 Ga. at 148.
[7] *Holcomb*, 268 Ga. at 103; *Sims*, 266 Ga. at 419-420.

girlfriend, and that he had known B for about six years, but had just met A in 1996.

Following the reasoning of the U. S. Supreme Court's decision in *Gray v. Maryland*,[8] we recently held that, even if the statement of a non-testifying co-defendant has been redacted to replace the name of the defendant with a word or symbol, it nevertheless violates a defendant's right of confrontation to admit that statement into evidence when it obviously refers to the defendant and implicates him.[9] We also noted, however, that "the Confrontation Clause is not violated by 'those statements that incriminate inferentially . . . statements that [do] not refer directly to the defendant himself and which become incriminating "only when linked with evidence introduced later at trial." [Cit.]' "[10]

In Langston's statement, Butler, White, and Smith were clearly either A or B or C or D. The statement, however, does not directly indicate which defendant corresponded with which letter. Moreover, the statement indicates that B and C were present at the scene and knew that A and D were planning to rob the three men, but it does not indicate whether B and C participated in the plan. Thus, the statement does not affirmatively implicate B and C. For these reasons, the identity of A and D and the culpability of B and C must be inferred from other evidence introduced at trial. Accordingly, we conclude that Butler's right of confrontation was not violated under the reasoning of *Hanifa* and *Gray*.

4. Butler and Langston contend that the trial court erred in denying their motions to sever their trials from those of their co-defendants. We find no error.

In ruling on a motion to sever, a trial court should consider whether the number of defendants will create confusion of the evidence and the law applicable to each individual defendant, whether there is a danger that evidence admissible against one defendant will be considered against another despite the cautionary instructions of the court, and whether the defenses of the defendants are antagonistic to each other or each other's rights.[11] Moreover, "[t]he defendant requesting a severance has the burden of making a clear showing of prejudice and a denial of due process in the absence of severance."[12]

Having reviewed the record, we find nothing indicating that the joint trial created confusion regarding the evidence or the law. Furthermore, as for the second prong of the foregoing analysis, Butler

---

[8] ___ U. S. ___ (118 SC 1151, 140 LE2d 294) (1998).

[9] *Hanifa v. State*, 269 Ga. 797 (505 SE2d 731, 736-738) (1998).

[10] *Hanifa* at 802, quoting *Gray*, 118 SC at 1157.

[11] *Loren v. State*, 268 Ga. 792, 795 (493 SE2d 175) (1997).

[12] Id.

contends that there was a danger that the jury would consider Langston's statement against Butler, and that this danger warranted separate trials. But, given the redaction of Langston's statement and the trial court's instruction informing the jury that Langston's statement was only admissible against him, we conclude that the trial court adequately protected Langston's co-defendants from the danger that his statement would be used against them.[13] Finally, Butler and Langston have failed to show how any defense by one of their co-defendants was antagonistic to their own defense so as to amount to a denial of due process.[14] For these reasons, we conclude that the trial court did not err in denying the motions to sever.

5. Contrary to Butler's contention, we conclude that the trial court did not err in permitting Rodney Crumbley to testify regarding statements that he heard Butler's co-defendants make on the evening of the crime. These statements were admissible against Butler under the co-conspirator exception to the hearsay rule.[15]

6. At trial, Butler sought to have a police officer testify regarding a statement that had been made to him by a witness during his investigation to the effect that Butler was in Smith's sister's apartment at the time the shots were fired. Butler contended the officer's testimony was admissible under the necessity exception to the rule against hearsay evidence. The trial court, however, excluded the statement on the ground that Butler had not adequately shown that the witness was unavailable.[16] We conclude that the trial court did not abuse its discretion in determining that Butler had failed to show that the witness was unavailable.[17]

7. Langston contends that, in denying his motion for new trial, the trial court erred in ruling that Langston had not received ineffective assistance of trial counsel. Langston contends that his counsel's performance was deficient because the evidence showed only one documented visit by trial counsel with Langston at the pre-trial detention center, and because counsel did not object specifically to the trial court's charge on alibi.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and

---

[13] *Bryant v. State*, 270 Ga. 266, 269-270 (507 SE2d 451) (1998).

[14] See *Weems v. State*, 268 Ga. 515, 516 (2) (491 SE2d 325) (1997); *Bryant* at 269-270.

[15] See *Waldrip v. State*, 267 Ga. 739, 746-747 (482 SE2d 299) (1997); OCGA § 24-3-5.

[16] "OCGA § 24-3-1 (b) permits the admission of hearsay evidence in 'specified cases [of] necessity,' so long as (1) the declarant is unavailable, and (2) there is a circumstantial guarantee of trustworthiness inherent in the statement." *Fetty v. State*, 268 Ga. 365, 367 (489 SE2d 813) (1997).

[17] See *Jones v. State*, 250 Ga. 166, 168 (2) (296 SE2d 598) (1982).

that the deficient performance prejudiced his defense.[18] We conclude that Langston has failed to meet both prongs of this test.

As for Langston's contention regarding trial counsel's visits, Langston appears to be contending that trial counsel did not adequately investigate the case and prepare for trial. At the hearing on the motion for new trial, however, trial counsel testified that he visited Langston on numerous occasions when he was not required to sign in, and he detailed various ways in which he investigated the case and prepared for trial. We conclude that Langston failed to carry his burden to prove that counsel's performance in preparing for trial was deficient.

Moreover, because Langston did not present an alibi defense, because the trial court charged the jury that the State had the burden to prove beyond a reasonable doubt that the defendants were parties to the crime or co-conspirators to the crime, and because Langston's trial counsel generally reserved the right to object to the trial court's charge, we cannot conclude that trial counsel's performance was deficient in failing to object specifically to the trial court's charge on alibi. Furthermore, Langston has failed to show how he was prejudiced by either of the alleged errors of trial counsel that he asserts on appeal.[19]

8. White contends that the trial court erred by failing to sever the offense of possession of a firearm by a convicted felon from his trial for the offenses of murder, armed robbery, and aggravated assault. We disagree.

First, contrary to White's contention, the Supreme Court's decision in *Old Chief v. United States*[20] does not support the proposition that the trial court erred in denying White's motion to sever the possession offense. Old Chief was charged, among other things, with assault with a deadly weapon and with violating 18 USC § 922 (g) (1), which makes it a crime for anyone to possess a firearm who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year. Old Chief offered to stipulate to the fact of the prior conviction, and contended that, based upon that stipulation, the district court should use its discretion under Federal Rule of Evidence 403 to rule that the probative value of the official record of his prior conviction (which would reveal the name and violent nature of the prior offense) was outweighed by its prejudicial impact. The district court disagreed with Old Chief, and the district court's decision was affirmed by the circuit court. The Supreme

---

[18] *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984); *Whitaker v. State*, 269 Ga. 462, 465 (499 SE2d 888) (1998).

[19] See *Whitaker*, 269 Ga. at 465.

[20] 519 U. S. 172 (117 SC 644, 136 LE2d 574) (1997).

Court, however, reversed, reasoning that, when a defendant stipulates to his legal status as a convict under 18 USC § 922 (g) (1), the probative value of the official record of that status is outweighed by the risk of its prejudicial impact.

*Old Chief* is not controlling in the present case for at least two reasons. First, as the foregoing discussion of *Old Chief* indicates, the question of severance was not at issue, and the Supreme Court did not intimate that severance was necessary to preserve Old Chief's right to a fair trial. Second, Old Chief offered to stipulate to the fact of his prior conviction, whereas White made no such offer in the present case. For these reasons, *Old Chief* does not require a reversal of the trial court's denial of White's motion to sever the possession offense.

Furthermore, under this Court's existing precedent, because White was indicted for felony murder with the offense of possession of a firearm by a convicted felon as the underlying felony, the possession offense was related to the more serious charges, and the trial court therefore did not abuse its discretion in denying the motion to sever.[21]

9. Finally, White contends that the trial court erred in permitting Rodney Crumbley to testify that Langston told him that he (Langston) thought White had "killed somebody." However, because Langston made this statement during the concealment phase of the conspiracy and before Langston was arrested and gave a statement to the police, this statement was admissible under the co-conspirator exception to the hearsay rule.[22]

10. Finding no merit to the defendants' contentions, we affirm the defendants' convictions.

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 19, 1999.

*Johnson, Prioleau & Lynch, Theodore Johnson,* for appellant (case no. S98A1738).

*Dwight L. Thomas, Caprice J. Small,* for appellant (case no. S98A1739).

*R. Gary Spencer,* for appellant (case no. S98A1742).

*Paul L. Howard, District Attorney, Bettieanne C. Hart, Assistant District Attorney, Thurbert E. Baker, Attorney General, Paula K.*

---

[21] *Haynes v. State*, 269 Ga. 181, 183 (496 SE2d 721) (1998).
[22] *Ottis v. State*, 269 Ga. 151, 154-155 (496 SE2d 264) (1998).

*Smith, Senior Assistant Attorney General, Daniel G. Ashburn, Assistant Attorney General,* for appellee.