## S99A0940. TURTLE v. THE STATE.
(520 SE2d 211)

HINES, Justice.

Paul Anthony Turtle appeals his convictions for malice murder, armed robbery, aggravated assault, and possession of a firearm dur-

ing the commission of a crime in connection with the fatal shooting of pawn shop manager Michael DePriest. Turtle claims that the trial court erroneously precluded him from presenting expert evidence of his psychiatric disorder; that trial counsel was ineffective for failing to present mental health evidence at hearings on the voluntariness of his inculpatory statements; that the court improperly refused to allow his counsel to show witness bias; and that the jury's verdicts were tainted because of improper jury investigation. For the reasons discussed below, the claims are unavailing, and we affirm Turtle's convictions.[1]

At about 12:30 p.m. on August 14, 1995, Turtle was seen entering a Gwinnett County pawn shop. He was wearing a cap and carried a duffle bag on his shoulder. Ten to fifteen minutes after Turtle entered, gunfire was heard coming from the shop. Jarman, who worked at an adjacent golf store, heard the noise, thought that some shelving might have collapsed, and went to see if he could be of assistance. As Jarman attempted to enter the pawn shop, Turtle opened the door and the two men were face to face. Turtle was carrying an AR-15 automatic rifle. He pointed the rifle at Jarman and pulled the trigger, but the gun misfired. Turtle also aimed the rifle at another man, Josey, who was sitting outside the golf store. Jarman told Turtle to stop, but Turtle fled the scene. After Jarman lost sight of Turtle, Jarman entered the pawn shop and found Michael DePriest lying fatally wounded on the floor, "gasping his last breaths." DePriest had been shot three times, twice in the side of the head and once in the shoulder; one of the gunshots was fired from approximately five inches away.

At the crime scene, police recovered bullet fragments and metal bullet jackets, all of which proved to have been fired from the same weapon. An officer, who was familiar with the interior of the pawn shop, noticed that some of the guns on display were in disarray and

---

[1] The crimes occurred on August 14, 1995. On January 22, 1997, a Gwinnett County grand jury indicted Turtle for malice murder, felony murder while in the commission of armed robbery, armed robbery, aggravated assault, and possession of a firearm during the commission of a felony. He was originally tried before a jury in June 1997, and a mistrial was declared after the jury was unable to reach a verdict. He was retried before a jury on September 8-12, 1997, and found guilty of all charges. On September 17, 1997, Turtle was sentenced to life imprisonment for malice murder, a consecutive twenty years incarceration for armed robbery, twenty years incarceration for aggravated assault to be served concurrently with the sentence for armed robbery, and five years incarceration for the firearm possession charge to be served consecutively to the sentences imposed for armed robbery and aggravated assault. Trial counsel filed a motion for new trial on October 7, 1997, and the motion was denied on November 6, 1997. Trial counsel withdrew from the case, and on June 26, 1998, new counsel filed an amended motion for new trial, which was denied on December 14, 1998. A notice of appeal was filed on December 21, 1998, and the appeal was docketed in this Court on March 30, 1999. The case was orally argued on June 22, 1999.

that a Colt AR-15 rifle, which had been in inventory, was missing; the rifle had not been sold prior to the shooting. Several months after the shooting, Turtle contacted a high school acquaintance to ask him if he wanted to buy a ".223" gun, which Turtle claimed he had purchased at a gun show. A Colt AR-15 rifle discharges a .223 caliber bullet.

While under investigation for unrelated crimes and after his arrest for those crimes, Turtle told police that he had information regarding the pawn shop murder; Turtle insisted that an acquaintance, J. T., was the shooter. However, investigation proved that J. T. was not a viable suspect. Because in his discussions with police, Turtle continually changed his story about the murder and J. T.'s alleged role in it, and knew many of the undisclosed details of the crimes, investigators began to suspect Turtle in the killing.

Turtle told various friends and cellmates that he himself had committed the armed robbery and murder, and he related some bizarre versions of the crimes, including that he escaped from the scene in a limousine, that he had used a submachine gun in the robbery, and that DePriest's killing was a cult sacrifice. But Turtle told his roommates that he intended to steal the Colt AR-15 rifle from the pawn shop, and that he shot DePriest when DePriest attempted to stop the theft.

In a live lineup, both Jarman and Josey identified Turtle as the assailant exiting the pawn shop. Turtle was also positively identified at trial.

1. The evidence was sufficient to enable a rational trier of fact to find Turtle guilty beyond a reasonable doubt of DePriest's murder and the related crimes. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Turtle fails in the contention that the trial court erred in not allowing his trial counsel to present expert evidence of the nature and symptoms of his diagnosed manic depression and bipolar disorder. Turtle's counsel sought to introduce testimony from a psychiatrist, who examined and evaluated Turtle, that people who suffer from manic depression or bipolar disorder are prone to be grandiose, and thus, to exaggerate and to fabricate. Turtle did not assert the alleged mental condition as a defense to the crimes; he denied he was the perpetrator and claimed an alibi. The apparent purpose was to explain Turtle's accusations against J. T. and Turtle's varied and incredible accountings of his own commission of the crimes. Citing *Sinns v. State*, 248 Ga. 385 (283 SE2d 479) (1981), the trial court ruled that the proffered testimony went to the question of Turtle's truth-telling ability, and that the jurors would be able to determine his credibility for themselves. Id. at 387 (3). However, the court further ruled, over the State's objection, that Turtle could cross-examine

witnesses on the issue.

It is certainly true that expert opinion testimony, even on the ultimate issue to be decided by the jury, is admissible if the expert's conclusion is beyond the ken of the average layperson. *Sinns v. State,* supra at 387 (3); *Smith v. State,* 247 Ga. 612, 619 (277 SE2d 678) (1981). However, the veracity of a defendant's statements is not an issue whose resolution requires the assistance of expert opinion. It is a question of credibility which is peculiarly within the jury's province. *Berry v. State,* 268 Ga. 437, 438 (1) (490 SE2d 389) (1997). The jury heard the strangeness of the details of some of Turtle's versions of events, and could determine for itself whether his accounts of the crimes were complete or partial fabrications.

Moreover, Turtle's contention of error is premised upon his alleged diagnosis of manic depression or bipolar disorder. However, the expert in question did not diagnose Turtle with such disorder. Turtle's counsel related that the expert stated that the only way to do so was to keep a person under observation and track the person's actions in general and reactions to medicine. The expert would state only that Turtle's symptoms and acts were consistent with bipolar disorder or, in the alternative, that he had some serious personality disorders.

What is more, Turtle can show no harm from the exclusion of the testimony for the purpose of demonstrating his propensity not to tell the truth. Turtle was allowed to cross-examine witnesses regarding his mental health problems and the impact on his behavior. Also, Turtle's father testified about his son's history of hospitalization for emotional and psychological problems; that Turtle has a problem with telling the truth or exaggerating; that whenever Turtle got into "any kind of scrape" or a little bit of trouble, he would tell stories to exaggerate what he had done; and that he would not believe his son even under oath.

3. Contrary to Turtle's contention, his trial counsel is not shown ineffective for failing to pursue certain mental health claims at proceedings regarding the voluntariness of his statements.[2] Initially, trial counsel filed an amended motion to suppress based, inter alia, on Turtle's alleged "mental condition and mental deficiencies"; it was asserted that because of such conditions, Turtle could not have knowingly and freely waived his right to counsel. Subsequently, Turtle underwent a mental evaluation at which his attorney was present. The examining doctor told the attorney that his report would indicate that he found no evidence of Turtle's mental impairment or

---

[2] This ground was raised in Turtle's amended motion for new trial; however, at the hearing in the matter, appellate counsel argued that trial counsel had been ineffective for "failing to file a notice of insanity."

mental incapacity. Based on his discussions with the doctor and his own observations, Turtle's counsel concluded that it was not viable to assert Turtle's mental incapacity and counsel so informed the court.

To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the inadequate performance prejudiced the defense. *Harris v. State*, 268 Ga. 412 (490 SE2d 96) (1997), citing *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). The defendant must overcome the strong presumption that counsel's conduct fell within the broad range of professional conduct and demonstrate that the outcome of the proceedings would have been different were it not for counsel's deficiencies. Id. This Turtle cannot do for he fails to make the threshold showing. Trial counsel cannot be found deficient for refusing to pursue Turtle's mental incapacity in the face of clear medical evidence to the contrary. What is more, even though any claim of incapacity was discarded, trial counsel continued to attempt to introduce evidence of Turtle's alleged emotional and psychological problems.

4. Turtle contends that the trial court erred in not allowing him to show the bias of a State's witness by demonstrating that the witness had pending criminal charges and a pending probation revocation. However, the contention is without merit. What the trial court refused to do was to allow for the purpose of impeachment the introduction of a certified copy of a petition to revoke the witness's probation. Nevertheless, defense counsel was permitted to cross-examine the witness about the probation revocation as well as the related theft charges and other criminal convictions. See *Hines v. State*, 249 Ga. 257, 259 (2) (290 SE2d 911) (1982). Moreover, defense counsel's stated purpose at trial for introducing the probation revocation petition was to question the witness, who was Turtle's one-time roommate, about whether the witness had continued to steal after he and Turtle had agreed to stop committing theft and other criminal activity. And defense counsel was permitted to question the witness about that very conduct.

5. Turtle's trial defense was that during the critical time frame he was transporting his sister for a dental appointment, to lunch, and then home. Several days after Turtle's trial concluded, a juror notified the trial judge that during deliberations, the jury foreman had "gone to the scene," "clocked the distance," and stated that Turtle "could have done it." The court conducted a hearing in the matter at which all the jurors were questioned. The hearing revealed that Turtle's claimed alibi was a point of discussion during deliberations; that the jury foreman had driven around the area in question to see if the timing of the alibi was plausible; that the foreman determined that the alibi testimony had credibility; and therefore, that he commented

to his fellow jurors that Turtle "could have done it." The remaining 11 jurors testified that the foreman's statements either were not heard at all; not interpreted as any comment about Turtle's guilt or innocence; or were considered comments supporting Turtle's alibi. Each of the jurors that heard the comments averred that the statements had no impact on the juror's determination of Turtle's guilt.

"To set aside a jury verdict solely because of irregular jury conduct, this Court must conclude that the conduct was so prejudicial that the verdict is inherently lacking in due process." *Butler v. State*, 270 Ga. 441, 444 (2) (511 SE2d 180) (1999). See also *Sims v. State*, 266 Ga. 417, 419 (3) (467 SE2d 574) (1996); *Bobo v. State*, 254 Ga. 146 (327 SE2d 208) (1985). Thus, the question is whether the foreman's act of commenting to the jury after his own investigation was prejudicial to the point of rendering the verdicts inherently without due process. *Butler* at 444 (2).

Here, the foreman's unauthorized investigation and comments were not aimed at establishing Turtle's guilt. Nor was there an affirmative attempt by the foreman to influence or to sway his fellow juror's votes by relating his observations. What is more, the foreman and each and every juror aware of his actions made it plain that the foreman's conduct had no impact on the verdicts. Compare *Bobo*, supra at 148 (1). Accordingly, it can be concluded that the irregular conduct was not so prejudicial as to have contributed to the convictions and to have made Turtle's trial fundamentally unfair. *Butler,* supra at 445 (2). Thus, the irregularity fails to provide a basis for granting Turtle a new trial.

*Judgments affirmed. All the Justices concur, except Fletcher, P. J., who concurs specially.*

FLETCHER, Presiding Justice, concurring specially.

I agree that the trial court did not err in excluding testimony from Turtle's expert witness regarding the symptoms of manic depression or bipolar disorder because there was no evidence that Turtle suffered from this mental illness. However, if the expert had diagnosed Turtle as manic depressive, then his testimony would be relevant and admissible. Turtle did not want to simply renounce his prior incriminating statements; he wanted to provide the jury with a credible explanation for the cause of his fabrications. Furthermore, the expert would not have testified that any particular statement was untruthful.

The focus on mental illness distinguishes this case from those in which the mere veracity of the defendant's statements is at issue. We have previously recognized that expert testimony may be helpful to the jury even when it touches upon the question of a witness's truth-

fulness.[3] Therefore, when a mental illness impacts the defendant's veracity and an expert witness is offered to describe that mental illness, the testimony should be admitted.

DECIDED SEPTEMBER 13, 1999.

*Sharon L. Hopkins,* for appellant.
*Daniel J. Porter, District Attorney, Thomas N. Davis, Assistant District Attorney, Thurbert E. Baker, Attorney General, Jeanne K. Strickland, Assistant Attorney General,* for appellee.

---

[3] *Barlow v. State,* 270 Ga. 54, 55 (507 SE2d 416) (1998) (expert testimony regarding interview techniques for child molestation victim admissible even though it indirectly involves witness credibility).