302 Ga. 691
FINAL COPY

S17A1475. DIXON v. THE STATE.
S17A1476. CAMPS v. THE STATE.

BLACKWELL, Justice.

Bernard Dixon and Arrick Camps were tried by a Bartow County jury and found guilty of malice murder and other crimes in connection with the shooting death of Robert Carr.[1] They appeal, both contending that the trial court erred when it refused to declare a mistrial for prosecutorial misconduct in the cross-

---

[1] The crimes were committed on April 7, 2015. On October 21, 2015, a Bartow County grand jury indicted Dixon and Camps (along with three others) for malice murder (Count 1), felony murder (Counts 2-5), kidnapping with bodily injury (Count 6), armed robbery (Count 7), aggravated assault (Counts 8-11), conspiracy to commit robbery (Count 12), false imprisonment (Count 13), and possession of a firearm during the commission of a felony (Counts 14-17). After their first trial ended in a hung jury, Dixon and Camps were retried jointly from March 28 through April 4, 2016. The trial court granted a directed verdict to both Dixon and Camps on Count 2 (felony murder), Count 6 (kidnapping with bodily injury), Count 13 (false imprisonment), and Count 15 (possession of a firearm during the commission of a felony). The jury found each defendant guilty on all other counts. After merging several counts for sentencing purposes, the trial court sentenced both Dixon and Camps to imprisonment for life plus five years. Dixon filed his motion for new trial on May 31, 2016, and his amended motion on November 22, 2016. Camps filed his motion for new trial on June 24, 2016, and he amended the motion on November 9, 2016. The trial court held a hearing and denied both defendants' motions in a combined order dated December 7, 2016. Dixon and Camps timely filed their notices of appeal on December 27 and 29, 2016, respectively. Their cases were docketed in this Court for the August 2017 term and submitted for a decision on the briefs.

examination of a defense witness. They also argue, each for different reasons, that the trial court erred when it refused to grant them new trials based on jury misconduct. We affirm.

1. Viewed in the light most favorable to the jury's verdict, the evidence at trial shows that Dixon, Camps, and three others — Elizabeth Kelley, Stephanie Gardner, and Rebecca Dover — made plans to rob Carr. The plan originated with Dover; she told Gardner about the opportunity, and Gardner invited Dixon and Kelley to participate. Some time later, Camps also joined the scheme. The robbery was to occur in Cartersville, and so, in the early morning hours of April 7, 2015, Kelley drove Dixon and Gardner from Marietta to a Chevron gas station in Cartersville. There, they met up with Dover and Carr. Dover was highly intoxicated and seemed to have lost interest in the robbery; she instead expressed a desire to play "ding-dings," which apparently are gaming devices similar to slot machines. The group then drove Dover (but not Carr) to a Sunoco gas station down the road to play ding-dings. Dover and Gardner stayed at the Sunoco, and Dixon and Kelley then picked up Camps from his house not far away. When they returned to the Sunoco, Gardner got in the car with Kelley, Dixon, and Camps, and the four drove back to the Chevron

2

to look for Carr with the intent to rob him (Dover had remained at the Sunoco). They did not find Carr at the station but got in touch with him via a cell phone and arranged to meet him outside a nearby hotel.

When the group arrived at the hotel, Gardner invited Carr into the vehicle, ostensibly to take him to rejoin Dover back at the Sunoco, and he sat in the back seat next to Gardner and Camps. But instead of going to the Sunoco, Dixon (who was in the front passenger seat) directed Kelley to drive to a secluded area with what looked like an abandoned warehouse. Dixon then pointed a gun at Carr and told him to get out. Carr obeyed, and Dixon followed him out. After a verbal exchange, Dixon shot Carr in the leg. Dixon then jumped back in the car, and the group drove off. Before going very far, however, Dixon said he forgot to check Carr's pockets, and then either Dixon or Camps said that they could not simply leave Carr lying there but had to go back and "finish him," as he could identify them. Kelley drove back to where Carr was shot, and she saw him walking and talking on the phone, saying "they shot me, they shot me." Camps grabbed the gun and jumped out of the car. Kelley heard gunshots and then saw Camps standing over Carr, with his arm angled toward the victim. Dixon then urged Camps to get back in the car, and the group drove off

3

hurriedly and went back to Marietta. During the course of the robbery, the group took Carr's backpack, but it was found to contain little of value. Carr's body was discovered later that morning. An autopsy revealed that he died of multiple gunshot wounds to the face, chest, and extremities.

Dixon and Camps do not dispute that the evidence is sufficient to sustain their convictions. Nevertheless, as is our customary practice in murder cases, we independently have reviewed the record with an eye toward the legal sufficiency of the evidence. We conclude that the evidence presented at trial is sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Dixon and Camps are guilty of the crimes of which they were convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Both Dixon and Camps argue that the trial court erred when it refused to declare a mistrial for prosecutorial misconduct. On the fifth day of trial, Camps called a witness who was a close friend of Carr. On cross-examination, the prosecuting attorney asked the witness why he was upset. When the witness replied that he was upset at the death of his "best friend" Carr, the prosecutor asked: "Now, this is a murder trial. Did you see [Dixon and Camps] talking and laughing a while ago?" The witness replied, "Yes I did." The alleged "talking

4

and laughing" referenced by the prosecutor occurred during a break in trial, outside the jury's presence. The defendants contend that this question by the prosecutor was irrelevant, prejudicial, and impermissibly placed the defendants' character at issue.

We generally review a trial court's denial of a motion for mistrial for abuse of discretion. Rivers v. State, 296 Ga. 396, 402 (6) (768 SE2d 486) (2015); McKibbins v. State, 293 Ga. 843, 848 (3) (750 SE2d 314) (2013). "[T]he denial of a mistrial is reversible error only if it appears that a mistrial was essential to preserve the defendant's right to a fair trial." McKibbins, 293 Ga. at 848 (3) (citation and punctuation omitted). Moreover, with regard to prosecutorial misconduct, OCGA § 17-8-75 provides:

> Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender.

In this case, pretermitting whether the prosecutor's question was, in fact, improper, the trial court fully complied with OCGA § 17-8-75 and did not abuse its discretion in refusing to grant a mistrial. The defense objected immediately

5

after the cross-examination in question, at which point the trial court held a bench conference outside the jury's presence and rebuked the prosecutor, telling him that the question was "totally inappropriate" and "it's not going to happen in this courtroom." The court then brought the jury back, told them that the prosecution had been admonished, and instructed them "to disregard the question or any response that was elicited as a result of that question."

"We ordinarily presume that a jury follows such instructions." Coleman v. State, 301 Ga. 720, 722 (3) (804 SE2d 24) (2017). Nothing in this case undercuts that presumption. To the contrary, the trial court specifically asked the jurors to "indicate by raising your hand if you feel that you would be unable to disregard the previous question and response elicited by the State," and none of the jurors raised their hand. In light of the foregoing, a mistrial was not necessary to preserve the defendants' right to a fair trial. See McKibbins, 293 Ga. at 850 (3) (c) (trial court did not abuse its discretion when it denied a mistrial after improper statement by prosecutor, "especially because the trial court promptly admonished the prosecuting attorney and told the jury to disregard the statement").

6

3. Both Dixon and Camps ask for a new trial due to juror misconduct. The record reflects the following issues with the jury. On the morning of the fourth day of trial, four jurors came before the court for questioning. Two of the jurors, R. M. and A. H., had expressed concern about a suspicious individual who was observed in the parking lot writing down jurors' license plate numbers. Camps had raised concerns about two other jurors, juror A. S. and alternate juror S. S., who had been seen talking during the trial. A. S. and S. S. were questioned separately to determine whether they had overheard anything about the suspicious activity and whether the jurors discussed the case among themselves. When A. S. was asked whether there had been "any discussion amongst the jurors about this case, about what's going on," she replied in the negative, and both defendants said they had no further questions of her. Juror S. S. also denied talking to A. S. (who had sat next to her) about the case, but admitted commenting that Camps's attorney was "monotonous." S. S. insisted that this was the only comment she made, even when both defense counsel pointed out that they had observed as much as 20 seconds of conversation between her and A. S. during trial.

7

After a bench conference, both defendants moved for a mistrial and, alternatively, for S. S.'s removal. Dixon moved for the removal of juror A. S. as well. The trial court refused to grant a mistrial, but did remove juror S. S. without objection from the State on the ground that she arrived late for court, slept during trial, and audibly conversed with A. S. But the trial court refused to remove A. S., explaining:

> I did observe communication between those two jurors. Now, I don't know what the communication was. I don't know if the communication was [A. S.] telling [S. S.], you know, please be quiet, you're talking too loud. I don't know what the communication was. But when asked this morning, [A. S.] said here that she didn't have any conversation about the case. So I'll just reemphasize that with the jurors again. That's all I can do.

When the jury was brought back in, the trial court instructed the jurors, among other things, not to talk to each other or with anyone else about the case until they retired for deliberations.

(a) On appeal, Dixon argues that the trial court should have granted a mistrial, or alternatively removed juror A. S., based on the audible conversation between her and S. S. We disagree. "To set aside a jury verdict solely because of irregular jury conduct, this Court must conclude that the conduct was so prejudicial that the verdict is inherently lacking in due process." Butler v. State,

8

270 Ga. 441, 444 (2) (511 SE2d 180) (1999); Sims v. State, 266 Ga. 417, 419 (3) (467 SE2d 574) (1996) ("Our inquiry . . . must be directed to whether this [jury irregularity] is so inherently prejudicial as to require a new trial, or whether it is an immaterial irregularity without opportunity for injury."). Here, the trial court gave Dixon the opportunity to question jurors A. S. and S. S., and both denied any discussion about the case. And there is no evidence that the jurors actually discussed any impermissible topics. To be sure, as Dixon points out, "[w]hen irregular juror conduct is shown, there is a presumption of prejudice to the defendant, and the prosecution carries the burden of establishing beyond a reasonable doubt that no harm occurred." Holcomb v. State, 268 Ga. 100, 103 (2) (485 SE2d 192) (1997). But as we have explained,

> the type of irregularity that gives rise to such a presumption of prejudice involves juror misconduct that has the potential to injure a defendant's due process rights, e.g., making an unauthorized visit to the crime scene and then presenting the findings to the jury panel; privately discussing the defendant's guilt prior to deliberations in violation of the court's instructions; or improperly accessing outside news sources.

Jones v. State, 282 Ga. 47, 50 (3) (644 SE2d 853) (2007) (citations and punctuation omitted). As mentioned above, there is simply no evidence that the conversation at issue between jurors A. S. and S. S. concerned Dixon's guilt or

9

other impermissible subjects. In any event, after this conversation came to light, juror S. S. was dismissed and the trial court reminded the jurors that they were not to discuss this case with anyone, including each other. Thus, "[w]e are satisfied that [A. S.'s and S. S.'s] actions were harmless beyond a reasonable doubt." <u>Sims</u>, 266 Ga. at 420 (3).

(b) Camps contends that his Sixth Amendment right to an impartial jury was violated by cumulative instances of irregular juror conduct, although he concedes that no particular incident alone would require reversal. Specifically, Camps points out that (1) two jurors expressed concern about being stalked and communicated this concern to other jurors; (2) alternate juror S. S. was questioned about inappropriate activity and then dismissed; and (3) juror A. S. sent a "strongly worded" note to the trial court upon her election as foreperson.[2] Camps also notes that juror A. S. was arrested for possession of hashish oil about two weeks after the trial.

---

[2] The note was sent on Friday, April 1, 2016, after the presentation of evidence and before jury deliberations began. The note was titled "Jury Requests," and it asked for an easel or white board, written and audio statements from defendants, and cell phone maps. The note also stated that the "Jury will dismiss at 5pm, 4/1/16 and Jury will resume 9am, 4/4."

As with the conversation between the two jurors, while the above incidents may have been unusual, they do not warrant a reversal. Concerning suspicious activity, the trial court assured the jurors that "we do everything, everything, to make sure that we're all safe and comfortable while we're here at this courthouse" and that "nothing that has happened in any way has been an indication to me or to any of the officials here that there has been a breach of security in any way." The record does not indicate that this instruction failed to alleviate the jurors' concerns or that their worries impacted their ability to listen to the evidence or decide the case. With regard to the note sent by juror A. S., while it might have been more deferential, it does not suggest to us that juror A. S. or any other jurors failed to take their duties seriously. As to A. S.'s post-trial arrest, she testified at the motion for new trial hearing that she consumed no illegal substances during trial, and the record does not suggest otherwise. Finally, concerning juror S. S., she was an alternate who was dismissed prior to deliberations, and nothing indicates that her behavior materially impacted other jurors. Simply put, the record contains no evidence that the above irregularities, even taken together, undermined the fairness of the trial or infringed Camps's right to due process. See Butler, 270 Ga. at 444 (2).

11

4. The jury found Dixon and Camps guilty of malice murder and armed robbery, among other crimes. At sentencing, the trial court merged the armed robbery into the murder and did not sentence Dixon and Camps for the armed robbery. That was error. See Culpepper v. State, 289 Ga. 736, 739 (2) (b) (715 SE2d 155) (2011). The State, however, does not raise this error by cross-appeal.

Even when no party raises a merger error, if we note such an error, we have the discretion to correct it on direct appeal. See Nazario v. State, 293 Ga. 480, 486-487 (2) (b) (746 SE2d 109) (2013). We have no obligation "to scour the record searching for merger issues" that no party has raised, and when a party fails to raise a merger error, "he risks that the court too may overlook the issue." Id. at 488 (2) (d). But sometimes a merger error is so clear and obvious that it comes to our attention even without the help of any party, and in those instances, we have the discretion to correct the error upon our own initiative. Most commonly, we have exercised that discretion in cases in which the error harms the defendant — cases in which the trial court erroneously convicted and sentenced a defendant for a crime that ought to have been merged, resulting in a conviction and sentence that were not legally authorized. See id. at 486-487 (2) (b); see also Donaldson v. State, 302 Ga. 671, 674 (4) (808 SE2d 720)

12

(2017). Three years ago, however, we recognized in <u>Hulett v. State</u>, 296 Ga. 49, 54 (2) (766 SE2d 1) (2014), that our discretion to correct merger errors that no party has raised is not limited to cases in which the error is harmful to a defendant. Since <u>Hulett</u>, we have exercised this discretion in a number of cases to vacate the erroneous merger of crimes for which defendants should have been sentenced, and we have remanded those cases for trial courts to sentence the defendants for the improperly merged crimes. See, e.g., <u>Brannon v. State</u>, 298 Ga. 601, 603 (2) (783 SE2d 642) (2016); <u>Jones v. State</u>, 299 Ga. 377, 381 (2) (788 SE2d 477) (2016).

We have the discretion to correct merger errors sua sponte — regardless of who is harmed by the error and who benefits from its correction — because a merger error results in an illegal and void judgment of conviction and sentence. See <u>Hulett</u>, 296 Ga. at 53-54 (2). There are powerful reasons to exercise that discretion when a merger error leads to an unauthorized conviction and sentence, particularly when it may cause the defendant to serve a total sentence that is longer than the law allows. A deprivation of liberty for even a moment more than the law permits is a serious wrong of constitutional magnitude:

13

Where a case challenging criminal convictions is properly brought before a court and the court realizes, on its own or based on the defendant's argument, that the record shows that certain convictions merged, to disregard that determination and allow the defendant to serve a sentence for a criminal conviction that has been identified as illegal and void would not comport with fundamental fairness and due process of law.

Nazario, 293 Ga. at 487 (2) (c). Moreover, the illegality of a void sentence cannot be waived, see id. at 485-486 (2) (b), and a merger error may form the grounds for habeas relief long after the judgment of conviction has become final. See id. at 488 (2) (d). For this reason, an exercise of our discretion on direct appeal to correct a merger error that harms a defendant (but of which he has not complained) may avoid unnecessary habeas proceedings and thereby promotes judicial economy.

But when a merger error benefits a defendant — resulting in a lesser sentence than the law required — and the State does not raise the error, it is not so clear that we ought to routinely exercise our discretion to correct the error. Such an error implicates no liberty interest. It poses no danger of unnecessary habeas proceedings, and judicial economy is not advanced by its correction. (Indeed, our correction of such an error only prolongs the judicial proceedings, inasmuch as it inevitably requires a remand for further sentencing.) And an

14

exercise of our discretion to correct such an error effectively penalizes the defendant for having brought his case before us. Although a defendant "who has been convicted of a crime has neither a vested right to nor a reasonable expectation of finality as to a pronounced sentence which is null and void," Hulett, 296 Ga. at 54 (2) (citation and punctuation omitted), we nonetheless perceive some unfairness in a practice that effectively penalizes defendants for exercising their right to seek appellate review of their convictions and sentences. For these reasons, we have determined that, when a merger error benefits a defendant and the State fails to raise it by cross-appeal, we henceforth will exercise our discretion to correct the error upon our own initiative only in exceptional circumstances.[3] Seeing no such exceptional circumstances here, we decline to exercise our discretion to correct the erroneous merger of the armed robbery, and we affirm the judgment below.

Judgment affirmed. All the Justices concur.

---

[3] As in this case, the State ordinarily is represented by competent counsel, and if the correction of a merger error were important to promote the law enforcement and correctional interests of the State, we would expect the prosecuting attorneys to properly bring the error to our attention by cross-appeal.

Decided December 11, 2017.

Murder. Bartow Superior Court. Before Judge Suzanne Smith.

John W. Howe, for appellant (case no. S17A1475).

Daniel D. Morgan, for appellant (case no. S17A1476).

Rosemary M. Greene, District Attorney, Sharon M. Fox, Andrew D. Garland, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Aimee F. Sobhani, Assistant Attorneys General, for appellee.