In the Supreme Court of Georgia

Decided: September 16, 2025

S25A0556. TUCKER v. THE STATE.

PINSON, Justice.

Shantony Tucker was convicted of malice murder and other crimes related to the death of his girlfriend, Brea Mance, and his cover-up of that crime.[1] On appeal, Tucker contends that the evidence was not sufficient to support the convictions because it did not

---

[1] Mance died between August 11 and August 12, 2017. A Warren County grand jury charged Tucker with malice murder (Count 1), felony murder (Count 2) aggravated assault, family violence (Count 3), arson in the first degree (Count 4), and concealing the death of another (Count 5). After a jury trial from April 1, 2019, to April 4, 2019, the jury returned verdicts of guilty on each count. On April 18, 2019, Tucker was sentenced to life without the possibility of parole for malice murder, followed by a consecutive term of 20 years for arson in the first degree. He was also sentenced to a term of ten years imprisonment for concealing the death of another, to run concurrent with the sentence for arson. The felony murder was vacated by operation of law. The court merged the aggravated assault count with the vacated felony murder count, but the aggravated assault count should have merged with the malice murder count instead. See *Malcolm v. State*, 263 Ga. 369, 373–74 (1993). Nonetheless, we decline to exercise our discretion to correct the merger error because it has not been raised and does not harm Tucker. See, e.g., *Dixon v. State*, 302 Ga. 691, 696–98 (2017).

exclude the possibility that Tucker killed Mance by accident or in self-defense and that the trial court failed to perform its role as the "thirteenth juror" at the motion for new trial stage. For the reasons that follow, we reject these claims, so Tucker's convictions are affirmed.[2]

---

Tucker timely filed a motion for new trial on April 26, 2019, which he later amended through new counsel. The motion was heard on November 28, 2023, and denied on December 8, 2023. Tucker timely filed a notice of appeal on December 26, 2023. His appeal was docketed to the April 2025 term of court and submitted for a decision on the briefs.

[2] Tucker's initial brief filed with this Court included no citations to the record and four citations to decisions that do not exist. This Court ordered Tucker's counsel to show cause why the appeal should not be vacated and remanded to the trial court to determine if counsel had abandoned Tucker. In response, Tucker's counsel asserted that the citations to nonexistent decisions were scrivener's errors, and he provided substitute citations and offered to file a corrected brief. Comparing the original and substituted citations, those errors would have included citing a combination of the incorrect volume, page number, and even case name, year, and court, for multiple cited decisions. The substitute citations point to decisions that support the general propositions for which they were cited, although those propositions were general enough that a large number of decisions might have been substituted in support. In light of this response, we struck Tucker's initial brief and ordered him to refile it with corrected citations. He did so within the time prescribed by the Court, and we decide his appeal based on the corrected brief.

Whatever doubts one could have about the explanation Tucker's counsel gave in his response to the show-cause order, questions about the veracity of counsel's representations, which would necessarily require assessment of credibility, are generally not for this Court to answer in the first instance in the context of an appeal dealing with a different matter. We have forwarded all filings related to this matter to the Office of the General Counsel of the State Bar of Georgia.

1. The evidence at trial showed the following. Tucker and Mance had been in an on-and-off romantic relationship for almost a year up until the time of her death. On the morning of August 11, 2017, Mance's cousin called and spoke to her on the phone. Her cousin also said hello to Tucker, whom she had heard speaking in the background. Tucker left to go to the store, and then Mance sent her cousin screenshots from social media of a baby she believed to be Tucker's. Mance also told her cousin that she and Tucker had gotten into a "fistfight" a few days earlier. Mance said she planned to leave Tucker but had not told him yet.

Later that day and the next morning, Mance's family members and friends could not reach her, and she did not show up for a planned outing. Also on the morning of August 12, Tucker called his brother, who lived nearby, and asked him to check on Mance at their home. When Tucker's brother arrived at the home, it was on fire. Tucker's brother tried to go inside, but the smoke drove him back out, and he called 911. Firefighters arrived and found Mance inside the home. One of the firefighters, who was also a paramedic, checked

for a pulse but could not find one. Once firefighters moved Mance outside, the deputy coroner pronounced her dead.

A fire investigator from the State Fire Marshal's Office was called to Mance and Tucker's home on the afternoon of August 12. Based on his investigation, he opined that the fire was intentionally set.

GBI Agents interviewed Tucker for the first time on August 15. He said that he had been with friends on the night of August 11 and spent the night with another woman. He said he tried to call Mance "several times" that night. When he returned home the next morning, he saw his home was on fire, contacted his mother, and told her to call 911.

Investigators obtained search warrants for Mance's and Tucker's phone records. The phone records "cast doubt on" Tucker's account because they placed his cell phone in the area where he and Mance lived during the early morning hours of August 12 and, contrary to Tucker's statement, the phone records did not show that he tried to call Mance several times on the night of August 11.

4

GBI Agents interviewed Tucker again on August 18. During the second interview, Tucker told investigators that Mance had taken diet pills and had a "reaction." He said she passed out and had been lying on the floor for 15 minutes when a friend picked up Tucker, and he left. Tucker said he went back to check on Mance around 5:00 a.m. the next morning, found her in a different spot than where she had been when he left, and smelled smoke. He said he then left the home and denied having anything to do with the fire that was later discovered or Mance's death.

Later in the interview, however, Tucker admitted that he set the home on fire. He said that he thought Mance had overdosed on the diet pills she had taken, and he set the fire to cover up her death.

Still later in the interview, Tucker said that he had "strangled" or "choked" Mance but had not meant to do so. He said that Mance had been upset when she learned he had a child with another woman, she pointed a gun at him, and he grabbed her by the throat and "took her to the ground," where he held her until she went "limp."

The medical examiner testified that Mance died as a result of "neck compression," but he could not determine the "mechanism" of compression. When asked whether Mance could have died from the "carotid sinus reflex," which can be caused by a "very minor grabbing of the neck," the medical examiner responded that it was possible but "exceedingly rare" for death to occur from the carotid sinus reflex. The medical examiner testified that, even if the "mechanism of compression" was carotid sinus reflex, he would still classify the death as a homicide "based on the circumstances."

The medical examiner also determined that Mance was already dead when the fire started and ruled out the fire as a cause of death. The medical expert called by the defense agreed with the medical examiner that Mance was dead when the fire started because there was no evidence of smoke inhalation, but opined that the autopsy alone did not show what caused Mance's death. So, in the expert's opinion, the medical examiner could have reached his conclusion that the cause of death was "neck compression" based only on

Tucker's statement that he had strangled her and not from the medical evidence; he would have classified Mance's cause of death as "unknown." When asked about death from the carotid sinus reflex, the expert explained that this cause of death would not be evident from the autopsy and that, in his experience, it happens when "one person squeez[es] on another person's neck and that person just drop[s] and d[ies] right then and there," which the doctor performing the autopsy would know from witnesses to the death.

2. Tucker contends that the evidence was not sufficient as a matter of Georgia statutory law because the evidence did not exclude the possibility that Mance's death was the result of an accident or self-defense.[3]

Under OCGA § 24-14-6, a conviction based solely on circumstantial evidence must be supported by evidence sufficient to "exclude every other reasonable hypothesis save that of the guilt of the

---

[3] To the extent Tucker contends that the trial court failed to assess the evidence of self-defense, and this could be read as invoking the general grounds, it fails for the reasons set out in the next division.

accused." But OCGA § 24-14-6 applies only when the evidence is entirely circumstantial, see *Towers v. State*, 314 Ga. 838, 841 (2022), and here, there is direct evidence of Tucker's guilt, including his statement to the police that he strangled Mance until she went "limp" and then set their home on fire to cover up her death. So OCGA § 24-14-6 does not apply, and his claim that the evidence was not sufficient as a matter of Georgia statutory law fails.[4] See *Mack v. State*, — Ga. — (2025), S25A0773, slip op. at 10 (Ga. Aug. 26, 2025).

3. Tucker contends that the trial court failed to meet its obligations under OCGA § 5-5-20, which authorizes a trial court to grant a new trial "[i]n any case when the verdict of a jury is found contrary to evidence and the principles of justice and equity." On appeal from

---

[4] Although Tucker makes a passing reference to the federal due process standard for sufficiency, see *Jackson v. Virginia*, 443 US 307 (1979), he has not offered any argument that the evidence was not sufficient under that standard and instead focuses on the contention that the State did not exclude every reasonable hypothesis except Tucker's guilt, see OCGA § 24-14-6. So any constitutional sufficiency claim under *Jackson* is deemed abandoned. See *Byrd v. State*, 321 Ga. 222, 225–26 (2025) (under the current version of Rule 22, "litigants must do more than just make an argument or cite authority, but must now ensure that argument, citation to authority, and citation to the record are all present to avoid having an enumeration deemed abandoned").

8

the denial of a motion under this Code Section, this Court reviews "whether the trial court exercised its discretion as the thirteenth juror, but the decision to grant a new trial on the general grounds is vested solely in the trial court and is not subject to our review." *Weston v. State*, 320 Ga. 472, 475 (2024) (quotation marks omitted). Here, the trial court's order reflects that it exercised its discretion as the thirteenth juror, so we do not review further the trial court's decision to deny a new trial after doing so. Id.

*Judgment affirmed. All the Justices concur.*