**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: December 10, 2024

S24A1113.  JILES v. THE STATE.

McMILLIAN, Justice.

In March 2020, a jury found Kaylon Janard Jiles guilty of felony murder and other crimes in connection with the shooting death of Eris Fisher.[1] On appeal, Jiles argues that (1) the trial court committed plain error by omitting a jury instruction on the

---

[1] Fisher was killed on November 5, 2017. On August 21, 2018, a DeKalb County grand jury indicted Jiles and co-indictee Traquan McLeod for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault (Count 3), possession of a firearm during the commission of a felony (Count 4), and a violation of Georgia's Street Gang Terrorism and Prevention Act (Count 5). McLeod entered a guilty plea to Count 1 (reduced to voluntary manslaughter) and Counts 4 and 5 in exchange for the State's agreement to enter a nolle prosequi on Counts 2 and 3. At a jury trial in March 2020, the jury acquitted Jiles of malice murder and participation in criminal street gang activity but found him guilty of the remaining counts. The trial court sentenced Jiles to serve life in prison without the possibility of parole on Count 2 and five years in prison on Count 4, to be served consecutively; Count 3 merged into Count 2 for sentencing purposes. Jiles filed a timely motion for new trial, which was amended by new counsel on June 22, 2023. The trial court denied the amended motion on February 6, 2024. Jiles timely appealed, and his case was docketed to the August 2024 term of this Court and submitted for a decision on the briefs.

requirements for accomplice corroboration; (2) his trial counsel rendered constitutionally ineffective assistance in several respects; and (3) the cumulative prejudice from these combined errors requires a reversal of his convictions. For the following reasons, we affirm.

The evidence presented at trial showed that Fisher and his associate, Laura Griffin, bought and sold cocaine together for several years. In late October or early November 2017, Fisher contacted Jiles to purchase one ounce of cocaine. On the morning of November 5, Jiles delivered the cocaine to Fisher and Griffin at a motel on Chamblee Tucker Road in DeKalb County, where they were both living at the time. After Fisher and Griffin finished "cooking" the cocaine, they realized the weight "was way off." Fisher called Jiles to complain that Jiles had shorted him on the cocaine, and Jiles accused Fisher of lying.

Maryanne Crawford, Fisher's wife, testified that she became aware of the dispute and attempted to mediate a resolution with Jiles, a long-time friend of hers. Jiles agreed to deliver five more

grams of cocaine to Fisher as a favor to Crawford. Crawford knew that both men were angry, so she texted Jiles and offered to pick up the cocaine and deliver it to Fisher. Jiles declined, stating that he would meet up with Fisher and "handle it." Crawford responded via text, "Please don't kill my husband, bro." When Jiles did not arrive by mid-afternoon, Fisher and Crawford left to run errands. While they were still out, Fisher called a mutual friend of his and Jiles's and said that "he wanted war because [Jiles] didn't show up." Shortly thereafter, Griffin called Fisher and told him that Jiles was waiting for him at the motel. Fisher and Crawford then returned to the motel.

When Fisher arrived at the motel parking lot and got out of the car, Jiles and two other men approached him. Crawford, who remained in the car, saw Jiles and one of the men with him shoot at Fisher. She ducked down inside the car and then heard a car speed out of the parking lot. Although she immediately identified Jiles as one of the shooters, Crawford did not tell officers about the cocaine purchase, instead offering various false motives for the shooting,

3

including that Fisher had been having a romantic relationship with Jiles's girlfriend. She explained at trial that she did not tell officers about the drug deal because she "didn't want to taint [Fisher's] name" and because she was worried that she would get in trouble for her role in facilitating the drug deal. Crawford also identified one of the men with Jiles as Traquan McLeod, whom she knew as Jiles's "hitter."[2] Crawford denied seeing Fisher with a gun that day.

Griffin testified that while Fisher and Crawford were out running errands, Jiles unexpectedly appeared at the motel with two other men and that all three men were armed, startling her. Jiles told Griffin that he was there to meet Fisher and asked her to call Fisher. Jiles and the other two men were standing next to Jiles's car in the parking lot when Fisher pulled up. Griffin watched their interaction from the third-floor balcony, but two of her friends, whom she knew as "Jesse" and "Little Man," went downstairs in case Fisher needed backup; Jesse was armed with a baseball bat, and Little Man had a gun. Fisher got out of the car alone and slowly

_____

[2] Officers were never able to identify the third man.

walked toward Jiles with his hands in his pockets. Jiles and the two men immediately faced Fisher, with all three men pointing their guns at Fisher. Fisher told Jiles that he "just came to talk" and that he "didn't want any trouble." Jiles told Fisher to get his hands out of his pockets, and Fisher repeated that he "just came to talk." Fisher did not raise a gun, but Jiles shot Fisher in the head. Fisher dropped to the ground without ever raising a weapon.[3] Griffin also saw McLeod shoot toward Jesse and Little Man, who were standing in the breezeway. Jiles and his two companions then "sped off" in a black four-door car. Griffin ran downstairs to try to help Fisher.

Griffin saw Crawford take money from Fisher's pockets as he was unresponsive on the ground. Griffin also noticed a gun laying on the ground next to Fisher; Griffin believed that the gun must have fallen out of Fisher's pocket when he fell to the ground. She wrapped the gun in a shirt and gave it to a friend to dispose of it.

---

[3] Fisher was pronounced dead at the scene. The autopsy revealed that Fisher had received three gunshot wounds, two to his legs and one to his head. The fatal shot would have immediately incapacitated Fisher.

She then left the scene before law enforcement officers arrived because she had an outstanding warrant for a probation violation. Griffin admitted at trial that when she was later interviewed by officers, she initially denied that Fisher had a gun on him that day. She explained that she had "wanted to make sure that he had a case without being judged for what he did" and that she was concerned the case would "go unknown because of gang-related or because of drugs or because of weapons."

Responding officers located surveillance video recordings from the scene. Those recordings showed that a total of one minute and fifteen seconds passed from when Fisher's vehicle entered the motel parking lot and when a dark Dodge Charger sped out of the parking lot. One recording showed a person standing in the parking lot when another individual walked over and appeared to shoot him before running to a nearby parked car. The first individual immediately dropped to the ground where Fisher's body was located when officers arrived at the scene.

The fugitive task force attempted to locate Jiles and conducted

6

surveillance at locations connected to his known associates. Jiles was eventually arrested in February 2018 when the fugitive task force located McLeod; Jiles was with McLeod in a black Dodge Charger owned by McLeod's mother. At that time, Jiles had significantly changed his hairstyle by adding extensions.

The State played several recordings of phone calls Jiles made from jail while awaiting trial, in which he claimed that he "didn't do s**t" and did not understand why he had even been arrested for Fisher's murder. During another recorded jail call, this time made in the middle of his trial, Jiles discussed with a friend his chances of being found not guilty, stating, "They say [Fisher] supposedly had a gun on him."

Jiles testified in his own defense at trial. According to Jiles, when Fisher called to complain that the cocaine was ten grams short, Fisher was immediately "aggressive" and "talking crazy," so Jiles hung up on him. Jiles also testified, however, that when Fisher called him back, saying, "It's on sight when I see you," he "kind of laughed at [Fisher]" because he "didn't take [Fisher's threat]

7

seriously." After Crawford called him, he agreed to give Fisher five grams, but told her that he would "never do business again" with Fisher. Jiles explained that, because Griffin "was a crackhead" and he thought "she tampered with the drugs," he wanted to deliver the five grams directly to Fisher. When he called Fisher and told him he would bring it to the motel, Fisher "made everything seem like it was cool."

According to Jiles, while he was waiting for Fisher at the motel, he saw Little Man standing on the balcony with "a bulge in his waist." Jiles told Griffin that he did not want to wait for Fisher any longer and started walking down the stairs with McLeod. He noticed Little Man walking behind them but "[didn't] pay it no mind." When Jiles had almost reached his car, Fisher hopped out of a car and started acting "aggressive again," cursing and demanding that Jiles give him the full ten grams. Jiles noticed that Fisher had his hand in his pants and asked him, "What you got your hands in your pants for?" Then he saw Fisher look at Little Man, and as Jiles turned to look, Little Man pulled out his gun and fired on Jiles. When Jiles

returned fire at Little Man, Fisher pulled out his gun and fired at Jiles. Jiles then turned back toward Fisher and "fired a few shots" at Fisher before turning back and firing more shots at Little Man before his gun jammed. Jiles claimed he "had no other choice but to act in self-defense." He and McLeod then got back in their car and took off. Jiles testified that he got rid of his gun because it had malfunctioned while he was firing it and that he fled to New York for two months because he "was scared for [his] life."

1. In his first enumeration of error, Jiles asserts that, because Crawford and Griffin were his accomplices to the murder, the trial court committed plain error by omitting an instruction on the requirement for accomplice corroboration and instructing the jury that the testimony of a single witness was sufficient to establish a fact.[4]

Jiles acknowledges that his trial counsel did not object to the

---

[4] Specifically, the trial court charged the jury: "The testimony of a single witness, if believed, is sufficient to establish a fact. Generally, there is no legal requirement of corroboration of a witness, provided that you find the evidence to be sufficient."

omission of this instruction, so we review this claim for plain error only. See OCGA § 17-8-58; *Baker v. State*, 319 Ga. 456, 461 (2) (902 SE2d 645) (2024). To establish plain error, Jiles must satisfy all four prongs of the following test:

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the *discretion* to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Baker*, 319 Ga. at 461-62 (2) (citation omitted; emphasis in original).

Pretermitting whether it was clear or obvious error not to give an accomplice corroboration charge, Jiles cannot demonstrate that any alleged error likely affected the outcome of his trial. See *Baker*, 319 Ga. at 461-62 (2). Both Griffin and Crawford testified that they did not see Fisher holding a gun at the time of the shooting. Also,

10

Jiles's claim of self-defense is belied by his actions immediately after the shooting – including disposing of the weapon, fleeing the state, and changing his appearance – and by the surveillance footage introduced at trial. And his recorded phone call from the jail during trial suggested that Jiles was unaware, until Griffin testified at trial, that Fisher may have been armed. See *Sauder v. State*, 318 Ga. 791, 806 (5) (901 SE2d 124) (2024) ("[G]iven the ample evidence corroborating [the alleged accomplices'] testimony about the . . . crimes, Sauder has not shown a reasonable probability that the outcome of his trial would have been different had the jury been instructed . . . that an accomplice's testimony must be corroborated."); *Whited v. State*, 315 Ga. 598, 604 (2) (883 SE2d 342) (2023) ("In other words, an accomplice-corroboration charge is not likely to affect a jury's verdict where evidence from the defendant's own lips in fact corroborated the potential accomplice testimony in question.").

Accordingly, Jiles cannot demonstrate plain error, and this enumeration of error fails.

11

2. Jiles also asserts that his trial counsel rendered constitutionally ineffective assistance in five ways. To prevail on this claim, Jiles must establish that (1) his counsel's performance was deficient and (2) the deficient performance resulted in prejudice to his defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984).

To demonstrate deficient performance, Jiles must show that his counsel "performed in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Ward v. State*, 318 Ga. 884, 896 (3) (901 SE2d 189) (2024) (citation omitted). In evaluating counsel's performance, we afford a "strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Wright v. State*, 314 Ga. 355, 357 (877 SE2d 178) (2022) (citation omitted). And "decisions about trial tactics and strategy in particular may not form the basis of an ineffectiveness claim unless they were so patently unreasonable that no competent

12

attorney would have followed such a course." *Warren v. State*, 314 Ga. 598, 602 (2) (878 SE2d 438) (2022) (citation and punctuation omitted). To show prejudice, Jiles "must show that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." *Zayas v. State*, 319 Ga. 402, 409 (3) (902 SE2d 583) (2024) (citation and punctuation omitted). If Jiles fails to establish either prong of the *Strickland* test, we need not address the other. See id.

(a) Jiles first asserts that his trial counsel provided ineffective assistance because he failed to request a jury instruction on accomplice corroboration and did not object to the single witness instruction as given.

At a deposition taken in connection with the motion for new trial,[5] trial counsel explained that his theory of the case was that Fisher was the primary aggressor and that Jiles acted in self-

---

[5] Due to trial counsel's schedule, the parties agreed to take the deposition of trial counsel for purposes of the motion for new trial hearing. There does not appear to have been any additional evidence or oral argument presented to the trial court.

defense. He pursued a "Bonnie-and-Clyde analogy" to show that Fisher and Crawford, along with Griffin, were working together to sell drugs, "were friends of [Fisher's]," and should not be trusted. Counsel also testified that part of his strategy was to "discredit" Crawford and Griffin through cross-examination and that not asking for a charge on corroboration of accomplice testimony was consistent with his strategy.

Based on the record before us, we cannot say that trial counsel's decision to portray Griffin and Crawford as Fisher's criminal associates – such that their testimony against Jiles should be "discredit[ed]" – rather than as Jiles's accomplices to Fisher's murder was "so patently unreasonable that no competent attorney would have followed such a course." *Hardy v. State*, 317 Ga. 736, 742 (2) (b) (893 SE2d 893) (2023) (rejecting ineffective assistance of counsel claim where trial counsel made a tactical decision to forgo an accomplice-corroboration instruction that would have contradicted the defense theory). Accordingly, this claim fails.

(b) Jiles next contends that trial counsel was ineffective in

14

failing to call a witness from the Georgia Bureau of Investigation ("GBI") to introduce evidence of Fisher's toxicology report. Trial counsel had attempted to cross-examine the medical examiner about this report, but the trial court sustained the State's objections to that line of questioning.[6] We are not persuaded.

After trial, the parties filed, and the trial court approved, a "Stipulation of Fact for Appeal" pursuant to OCGA § 5-6-41 (i),[7]

---

[6] The trial court sustained the objections after finding that the victim's toxicology results would only be relevant if Jiles also proffered evidence about how the victim's drug use tended to affect his behavior, relying on our holding in *Ivey v. State*, 305 Ga. 156, 162-63 (2) (d) (824 SE2d 242) (2019) (Because defendant "offered no evidence . . . about how [the victim's] drinking affected his behavior[,] in particular [whether the victim] acted aggressively when he drank alcohol[,] . . . [defendant] has failed to demonstrate that the toxicology report would have been admissible at trial.").

[7] OCGA § 5-6-41 (i) provides: "In lieu of sending up a transcript of record, the parties may by agreement file a stipulation of the case showing how the questions arose and were decided in the trial court, together with a sufficient statement of facts to enable the appellate court to pass upon the questions presented therein. Before being transmitted to the appellate court, the stipulation shall be approved by the trial judge or the presiding judge of the court where the case is pending." See also *Holmes v. Roberson-Holmes*, 287 Ga. 358, 361 (1) (695 SE2d 586) (2010) ("Even where parties actually *do* agree on the facts and execute a 'stipulation of the case' with a sufficient statement of facts to enable an appellate court to pass upon the questions presented, that stipulation must have attached the approval of the trial judge, OCGA § 5-6-41 (i), before an appellate court would be authorized to use that stipulation to consider the enumerations of error as having been raised in the trial court in accordance with the statements contained therein." (emphasis in original; cleaned up)).

which stipulated the following:

(1) On November 15, 2017, the Georgia Bureau of Investigation toxicology laboratory received from the DeKalb County Medical Examiner a sealed package containing three tubes of blood collected from Er[]is Fisher.

(2) The GBI gas chromatography/mass spectrometry exam of Fisher's blood sample showed positive results for methamphetamine and cocaine.

On appeal, Jiles argues that the toxicology results would have shown that drugs were present in Fisher's blood at the time of the confrontation and would have corroborated Jiles's defense theory that Fisher was the hostile, inebriated aggressor in their confrontation. However, Jiles did not present any evidence from a GBI toxicology expert in connection with the motion for new trial. Moreover, no evidence was admitted at trial or at the motion for new trial stage regarding the level of drugs detected in Fisher's blood, how long the drugs could have remained in his system, or whether the drugs were in sufficiently high concentration to affect Fisher at the time of the shooting. Nor did Jiles offer any evidence to show that Fisher's behavior at the time of the shooting demonstrated he

16

was under the influence of drugs or how such behavior affected Jiles's decision to shoot Fisher. This is the type of evidence that we have held is required for the report to be relevant and thus admissible. See *Mondragon v. State*, 304 Ga. 843, 845-46 (3) (823 SE2d 276) (2019) (toxicology report inadmissible where defendant was unable to proffer evidence of the effect that the victim's blood alcohol content would have had on the victim or even the effect that drinking alcohol had on the victim generally).

Thus, even assuming that a GBI toxicology expert would have testified that Fisher's blood sample showed positive results for methamphetamine and cocaine, as stipulated to by the parties for the purposes of this appeal, and assuming such testimony would have been admissible, reasonable counsel could have made the strategic decision that such testimony standing alone would not have been particularly probative of Fisher's actions and may not have been admissible. See *Matthews v. State*, 301 Ga. 286, 289 (2) (800 SE2d 533) (2017) ("Typically, the decision whether to present an expert witness is a matter of trial strategy that, if reasonable,

17

will not sustain a claim of ineffective assistance."); *Mondragon*, 304 Ga. at 845-46 (3). Accordingly, this ineffective assistance claim fails.

(c) Jiles also asserts that trial counsel failed to effectively cross-examine Griffin on Fisher's response to cocaine or methamphetamine usage and temperament while under the influence of those drugs to support his claim of self-defense.

However, Jiles did not present any testimony at the motion for new trial stage as to what Griffin would have testified to regarding Fisher's typical reaction to cocaine or methamphetamine. And, at his motion for new trial deposition, trial counsel testified that Jiles never claimed to have observed Fisher under the influence of drugs before the shooting, so he did not believe it would be useful to cross-examine other witnesses about Fisher's reaction to cocaine or methamphetamine.

Because Jiles did not show what Griffin's testimony would have been about Fisher's typical reaction to drugs or claim that Jiles was aware that Fisher was under the influence of drugs at the time of the shooting, Jiles cannot show that his trial counsel performed

unreasonably in failing to cross-examine Griffin about Fisher's reaction to cocaine or methamphetamine to support Jiles's claim of self-defense. See *Gaston v. State*, 307 Ga. 634, 643 (2) (d) (837 SE2d 808) (2020) ("Absent a showing that the extent of . . . cross-examination was objectively unreasonable, [appellant] cannot establish that his trial counsel performed deficiently."). And because Jiles has failed to show what additional cross-examination would have yielded on this issue, he likewise has not established prejudice under *Strickland*. See *Johnson v. State*, 310 Ga. 685, 692 (3) (853 SE2d 635) (2021) (appellant failed to show prejudice where he offered no evidence regarding what counsel could have elicited on cross-examination); *Clements v. State*, 301 Ga. 267, 271 (3) (b) (800 SE2d 552) (2017) ("Absent any evidence to show that his counsel acted unreasonably or that these alleged witnesses would have provided testimony favorable to [appellant's] defense, this ground of ineffective assistance of counsel must also fail."); *Lupoe v. State*, 284 Ga. 576, 578-79 (3) (b) (669 SE2d 133) (2008) (ineffective assistance of counsel claim failed where appellant was unable to demonstrate

that the testimony would have been favorable to his defense).

(d) Jiles claims that trial counsel was ineffective by failing to object to the trial court's jury instruction on aggravated assault because the instruction constructively amended Counts 2 and 3 (felony murder and the predicate felony of aggravated assault, respectively). Count 3 of the indictment charged Jiles with aggravated assault on the basis that he "did make an assault upon the person of Eris Fisher with a deadly weapon, to wit: a handgun, by shooting him with said handgun." The trial court, however, instructed the jury:

> A person commits the offense of aggravated assault when that person assaults another with a deadly weapon. To constitute such an assault, actual injury to the alleged victim need not be shown. It is only necessary that the evidence show beyond a reasonable doubt that the defendant attempted to cause a violent injury to the alleged victim and/or intentionally committed an act that placed the alleged victim in reasonable fear of immediately receiving a violent injury.

Jiles argues that because this instruction is based on an uncharged method of committing aggravated assault – that the defendant "intentionally committed an act that placed the alleged victim in

20

reasonable fear of immediately receiving a violent injury" – it improperly expanded the indictment and his trial counsel was deficient in failing to object.

We assume without deciding that trial counsel was deficient in failing to object to this instruction on a method of aggravated assault not charged in the indictment. However, Jiles has not shown the requisite prejudice. We have repeatedly explained that "charging the jury on a method of committing a crime not charged in the indictment does not likely affect the outcome of the proceedings when the jury is also instructed—as it was here—that the burden of proof rests upon the State to prove every material allegation of the indictment and every essential element of the crime charged beyond a reasonable doubt" and provided with a copy of the indictment during deliberations.[8] *Gude v. State*, __ Ga. __, __ (1) (__ SE2d __)

---

[8] The trial court also charged the jury on felony murder with the underlying felony of aggravated assault as follows:

> The defendant Kaylon Janard Jiles is charged in count 2 of the indictment with the offense of felony murder, which is defined as follows. A person commits the crime of murder when, in the

21

(S24A1356 November 5, 2024) (punctuation omitted; collecting cases holding the same). See also id. at ___ (1) n.6 (noting that "prior holdings on jury instruction issues that were not related to the Evidence Code were not abrogated by the enactment of Georgia's current Evidence Code").

And, as in *Gude*, it is highly unlikely that the jury convicted Jiles of felony murder predicated on aggravated assault without a finding that Jiles intended to shoot Fisher because Jiles admitted to shooting Fisher in self-defense, a defense on which the jury was also charged. See *Gude*, __ Ga. at __ (1); see also *Cato v. State*, 304 Ga.

---

commission of a felony, that person causes the death of another human being. Under the laws of Georgia, aggravated assault is a felony and is defined as follows. When a person assaults another person with a deadly weapon. A firearm, when used as such, is a deadly weapon.

If you find and believe beyond a reasonable doubt that the defendant committed the homicide alleged in this bill of indictment at the time the defendant was engaged in the commission of the felony of aggravated assault, then you would be authorized to find the defendant guilty of murder, whether the homicide was intended or not.

A person commits aggravated assault when he assaults another person with a deadly weapon.

496, 498-99 (2) (820 SE2d 41) (2018) (concluding that "the context of the instructions made the juror confusion suggested by [appellant] even more unlikely," where he was "charged with felony murder, the jury was properly instructed on felony murder, and there was no dispute that [the victim] died as a result of being shot (not as a result of being placed in fear)").

Nonetheless, Jiles argues that the reversal of the appellant's aggravated assault conviction based on a similar charging error in *Talton v. State*, 254 Ga. App. 111 (561 SE2d 139) (2002), requires the reversal of his convictions here. This argument fails. As we explained most recently in *Gude*, the facts of *Talton*—a ruling that is not binding on this Court—are readily distinguishable in murder cases such as this because the shooting victim in *Talton* was not killed, the appellant was not charged with felony murder, and the jury could have found appellant guilty of aggravated assault based on the erroneous "reasonable fear of receiving violent injury" instruction. See *Gude*, __ Ga. at __ (1). Here, on the other hand, the jury found Jiles guilty of felony murder, which necessarily required

23

a finding that Jiles killed Fisher by shooting him, and "there was virtually no chance that the jury based that finding on an intent to merely place [him] in fear of being shot, rather than an intent to shoot [him]." Id. See also *Patel v. State*, 278 Ga. 403, 407 (5) (603 SE2d 237) (2004) (because Patel "was charged with felony murder predicated upon an aggravated assault[,] [i]t follows that, unlike *Talton*, the jury could not convict defendant by simply showing that he pointed a pistol at the victim; of necessity, it had to find that defendant shot the victim"). Accordingly, Jiles cannot show prejudice from trial counsel's failure to object.

(e) Jiles asserts that trial counsel was deficient for failing to raise hearsay and bolstering objections to Crawford and Griffin's recorded interviews with law enforcement officers. We disagree.

After Crawford and Griffin were cross-examined at trial, the State admitted their recorded interviews to provide context to their statements under the rule of completeness. Trial counsel testified at his deposition that he did not object because he believed the interviews were admissible as prior consistent statements.

24

We first note that, because the recorded interviews were the witnesses' own statements, Jiles cannot establish deficient performance for failing to object on bolstering grounds. See *Harmon v. State*, 319 Ga. 259, 266 (3) n.7 (903 SE2d 28) (2024) (clarifying that "bolstering" refers to one witness vouching for the credibility of another and explaining that there is no improper bolstering "[w]hen a witness's statement does not directly address the credibility of another witness" (citations and punctuation omitted)); *Jackson v. State*, 318 Ga. 393, 402 (1) (e) (897 SE2d 785) (2024) (trial counsel not deficient for failing to make a meritless objection).

And although we question trial counsel's assessment that the recorded interviews were admissible as prior consistent statements as defined by our Evidence Code, see OCGA § 24-6-613 (c), Jiles has nonetheless failed to demonstrate deficient performance. Part of trial counsel's strategy was to discredit Crawford and Griffin by pointing out the differences between their prior statements and their trial testimony. The admission of those statements, in which both witnesses lied repeatedly to investigators about critical details,

25

including whether Fisher was armed that evening and why the two men were angry at each other, aided that strategy. See *Sawyer v. State*, 308 Ga. 375, 385-86 (2) (c) (839 SE2d 582) (2020) (rejecting claim of ineffective assistance where trial counsel's decision not to object to detective's testimony about witness's prior statement was not unreasonable strategy in light of overarching defense strategy to discredit the witness). Because this was not a patently unreasonable strategy, this ineffective assistance claim fails. See *Moulder v. State*, 317 Ga. 43, 52 (3) (b) n.14 (891 SE2d 903) (2023) ("[W]e are not limited in our assessment of the objective reasonableness of lawyer performance to the subjective reasons offered by trial counsel for his conduct. If a reasonable lawyer might have done what the actual lawyer did – whether for the same reasons given by the actual lawyer or different reasons entirely – the actual lawyer cannot be said to have performed in an objectively unreasonable way." (citation omitted)).

3. Lastly, Jiles maintains that the cumulative prejudice from the combined trial court errors and trial counsel's ineffective

assistance requires a reversal of his convictions. We are not convinced. "To demonstrate cumulative prejudice that warrants a new trial, [Jiles] must show that at least two errors were committed in the course of the trial; and considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied [Jiles] a fundamentally fair trial." *Henderson v. State*, 318 Ga. 752, 759 (3) (900 SE2d 596) (2024) (citation and punctuation omitted).

Although we have presumed error in Divisions 1 and 2 (d), it is highly probable that the combined effect of the trial court's instructional error and trial counsel's failure to object to an instructional error did not contribute to the verdict. As we noted in Division 1, even if we assume that it was clear or obvious error to fail to give an accomplice corroboration charge, the testimony of Griffin and Crawford was sufficiently corroborated. And, as shown in Division 2 (d), Jiles's ineffective assistance claim on this ground pertains only to a single incorrect definition of aggravated assault that was elsewhere corrected by the trial court, and it was highly

unlikely that the jury found Jiles guilty of felony murder without finding that he intended to shoot Fisher. Thus, even assuming without deciding that it is appropriate to cumulate the errors from a trial court's failure to give a specific jury instruction and an ineffective assistance of counsel claim, see *Park v. State*, 314 Ga. 733, 745 (4) (879 SE2d 400) (2022) (noting we have yet to decide how multiple standards for assessing prejudice may interact under cumulative review for different types of errors), Jiles has not shown that these presumed errors likely affected the outcome of his trial. See id. (concluding appellant's claims of cumulative prejudice failed under even the higher standard implicated by the alleged errors).

*Judgment affirmed. All the Justices concur.*