NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: February 18, 2025

S25A0070.  TUCKER v. THE STATE.

MCMILLIAN, Justice.

Deangelo Tucker was convicted of murder and other charges for the shootings of Nathaniel Lowe, Rondelrick Dukes, and Leonard Guffie, and the resulting death of Lowe.[1] On appeal, Tucker argues that the evidence was not sufficient to support his convictions.

_____

[1] The crimes occurred on November 16, 2014. On April 7, 2015, a Fulton County grand jury indicted Tucker for participation in criminal street gang activity (Count 1), malice murder (Count 2), felony murder (Count 3), three counts of aggravated assault (Counts 4-6), burglary in the first degree (Count 7), and possession of a firearm during the commission of a felony (Count 8).

At a trial from March 26 through April 3, 2018, a jury found Tucker guilty of all counts. On April 5, 2018, the trial court sentenced Tucker to serve life in prison for Count 2, a consecutive 10-year sentence in prison for Count 1, three concurrent 10-year sentences in prison for Counts 5 - 7, and a consecutive five-year sentence in prison for Count 8. Count 3 was vacated by operation of law, and the trial court merged Count 4 into Count 2 for sentencing purposes.

Tucker filed a timely motion for new trial on April 4, 2018, which was later amended on March 29, 2023. Following a hearing on July 31, 2023, the trial court denied the motion for new trial, as amended, on August 17, 2023. Tucker filed a timely notice of appeal on September 13, 2023, and the case was docketed to the term of this Court beginning in December 2024 and submitted for a decision on the briefs.

Tucker also argues that the trial court erred (1) in permitting the State to introduce evidence about the content of certain text messages without introducing the text messages themselves, (2) by failing to charge the jury on justification, (3) in its definition and charge on aggravated assault, and (4) in admitting irrelevant and prejudicial evidence from his phone and social media accounts. For the following reasons, we affirm in part, vacate in part, and remand the case for resentencing.

The evidence presented at trial shows the following. Before his death, victim Lowe was associated with Goodfellas gang member Orentheal Childs, who had confided to a couple of his friends that he wanted to "go straight" and "get away from the gang." It is understood among the Goodfellas, however, that "the only way out of [the] gang is in a body bag." On the night of February 15, 2013, Childs, Toddrick Freeman, Farrakmad Muhammad Price, Rodicus Strickland, and brothers Lowe and Damien Mayer were walking "to a party" when – according to Mayer – Price and Strickland "started shooting" at Childs. Childs survived, but he was shot 15 times.

2

The five people present at the scene were arrested. While the other three remained in custody, Lowe and Mayer bonded out and were planning to testify against them in the upcoming trial.

On November 15, 2014 – shortly before the trial was to begin – Mayer was "standing outside [the house where he lived] talking to . . . Rickeshia Maloney" when he was approached by a man he had not seen before. The man asked, "[W]here the lady [ ] stay at that sell slushies," and Mayer pointed in the direction of his house.[2] When later talking with detectives, Mayer described the man as 6' to 6'3" tall and approximately 250 pounds, with "facial hair, . . . a short Afro hairstyle." Mayer believed that he was between the ages of 20 and 25. Maloney said the man was wearing "a jacket and blue jeans and Timberland boots."

The man knocked on the door, Patrina Banks opened it, and the man asked for Lowe. Banks responded that Lowe was not home, and the man left. Banks described the man as about 5'11" tall and

[2] Patrina Banks is the mother of both Mayer and Lowe. She often sold items – like slushies, candies, and plates of food – out of her living room to members of the community.

"kind of heavyset," with a "lazy eye"; he was wearing an "orange hat" and a "brown jacket" "with a hood" or a "black hoodie." When Banks later asked Lowe about the man, he said he did not know him. Banks later identified Tucker from a photo lineup as the man who came to her door.

The following day, on November 16, 2014, Lowe, Dukes, Guffie, Jabari Smith, and Dajour Brown were hanging out in Banks's living room while Banks was upstairs bathing some of her younger children. Mayer was again standing outside the house with Maloney, and they saw the same man that Mayer had spoken to the day before "wearing some Timberland boots, some jeans, . . . a jacket, . . . a [black] skull cap," and gloves. This time, the man did not speak to Mayer but walked straight to Banks's door and knocked. When the door was opened, Mayer saw an immediate struggle and heard gunshots about a minute and half later. The man then ran away. Mayer later identified Tucker from a photo lineup as the man that he saw knock on the door on the day of the shooting and who had been to the house on the day before.

When Tucker knocked on the door, Lowe answered, said "[O]h, s**t," and then an immediate struggle ensued between the two men. Tucker "bust[ed] in" and began shooting; he shot Lowe twice, Dukes twice, and Guffie once. Everyone ran out of the living room in separate directions. From upstairs, Banks heard screaming, someone say "[H]e got a gun, he got a gun," and then several gunshots, so she called 911. During the 911 call, several people can be heard describing the shooter, and someone mentions that "he came to the house yesterday knocking on the door."

When officers arrived, they noted "shell casings" and that "the front door had been kicked in," "the doorframe was damaged," and that it "looked like there had been some sort of altercation inside the apartment." They found Lowe lying on the side of the road. He had suffered two gunshot wounds – one to his back and one to his right arm – and was pronounced dead at the scene.

Shaquitta Smith, Lowe's stepmother, testified that Shameka Smith – her niece and the mother of two of Tucker's children – told her that she had information about the murder. Specifically,

Shaquitta testified that sometime after Lowe's death, Shameka showed her text messages where Tucker had texted Shameka to "turn the GPS off" on her phone. Once she had, Tucker texted that he just "wet up three people . . . and that one of them was killed"[3] and that he "was there to try to help a friend." Shaquitta informed Detective Summer Benton about the text messages on November 22, 2014. Detective Benton testified that Shaquitta said that she believed "preempted robbery" was a possible motive for the shooting. She said that, according to Tucker, he understood that Lowe and his friends were going to rob Tucker, so he felt it necessary to rob them first.

Detective Benton later spoke with Shameka directly. Shameka described the text messages that she had received from Tucker on the night of the shooting. She also offered that Tucker was "well aware" that iPhones could be tracked and that is likely why he asked her to turn her GPS off. The text messages were never recorded, and Shameka told Detective Benton that she had lost her cell phone by

---

[3] According to Shaquitta, "wet" means "shot."

that point. Shameka also told Detective Benton that Tucker had held her "at gunpoint" because he "was extremely upset with her that she had gone to the police about him."

Detectives pulled Shameka's cell phone records. The content portion of the records showed no messages sent between Tucker and Shameka on November 16 or 17, 2014. The phone records expert testified, however, that there were columns indicating that certain messages had been sent, even though no related content appeared for them. Shameka's phone records, however, did indicate that she texted someone on November 19 asking them to "call the police . . . I'm down here wit[h Tucker] he won't [l]et me leave he gotta gun." The following day, she sent a message to the same number: "Thank you [for] helping me yesterday."

In December 2015, officers pulled over Dontavious Burnham for invalid tags and found a black .45-caliber Hi-Point pistol, with scratched-off serial numbers, in his possession. Burnham testified that he had purchased the handgun from a friend at work. Ballistics testing confirmed that the cartridge casings found at the Lowe crime

scene were fired from that Hi-Point pistol. Through their investigation, law enforcement came to believe that Tucker had sold the gun to Burnham in early 2015 through some intermediaries.

Tucker was arrested on January 7, 2015. When interviewed by Detective Benton, Tucker agreed with Detective Benton that he had sent the text messages. But Tucker stated that "maybe I sent them wrong or maybe they were interpreted wrong." He also told detectives that he "meant for it to say we was going to go help find out who killed [Lowe], not that I killed [Lowe]"; "if it was a text message, it had to be a typo." Throughout the interview, Tucker maintained that he did not kill Lowe.

Through their investigation, law enforcement determined that Tucker owned two cell phones at the time of his arrest, but an extraction was only successful on his LG phone; Detective Benton never obtained access to Tucker's iPhone. Many messages found on Tucker's LG phone were related to the buying and selling of guns and cell phones. Tucker was communicating with someone around the time of the homicide, but the number was not saved as a contact

8

in Tucker's phone list and could not be identified. The incriminating text messages to Shameka were not found.

Shameka recanted her story at trial, testifying that she "made mistakes and lied on [her] baby daddy." She testified that she received a call from Shaquitta on November 16, 2014, saying that "her stepson got killed." Shameka said that she then texted her "baby daddy," Tucker, who "was going to find out who - - what happened for [her] and that [they] didn't have to worry about it." Shameka admitted that she told Detective Benton that Tucker "said he had did a shooting"; that Tucker "threatened [her] a few days after the homicide"; and that she "didn't want to cooperate because [Tucker's] family was actually mad at [her] for what [she] said." But she testified that "everything she told [Detective Benton] was a lie . . . that [Benton] had the wrong person." However, Shameka did call Detective Benton on the day that Tucker was arrested and said that "Tucker's family was extremely upset with her and very mad and that she no longer wanted to cooperate with the investigation."

Tucker also testified in his own defense. According to Tucker,

9

Shameka called him on December 31, 2014, and told him to turn off his phone's GPS and call her from a different phone. She proceeded to tell Tucker that a detective had pulled some phone records "talking about you[r] text said you shot three people, killed one."

Tucker presented an alibi defense at trial. He testified that he was at a recording studio with his friends, whom he referred to as "Phi," "Shawn," "Bam," and "Mimi," between 6:00 p.m. and 8:00 p.m. on November 16, 2014. Tyrane Middlebrooks testified that he was also at the studio – located "on Jonesboro Road right by South Atlanta High School" – with Tucker. Though they were in the studio a lot and Middlebrooks could not recall other specific dates, he testified that he could remember November 16, 2014, because they "had this day planned."

Tucker said that he only had one cell phone – the LG – at the time and took it with him to the studio. No other evidence was presented as to who, if anyone, was in possession of the LG phone at the time, and Tucker testified that he often let others use his cell phone. The shooting occurred around 6:50 p.m. Cell phone tower

information placed Tucker's LG phone in an area near South Atlanta High School – which was 4.24 miles from where the shooting took place – at 6:47 p.m. Tucker claimed that he learned about Lowe's murder when Phi posted about it on Facebook between 9:00 p.m. and 10:00 p.m. that evening and that he did not speak with Shameka.

Though Tucker admitted to having prior gang affiliations, he testified that he was not part of the Goodfellas gang. Photographs pulled from Tucker's social media pages and cell phone showed him and others handling various firearms, throwing up gang symbols, and "flagging."[4] Many of his posts were captioned with words and phrases that, according to the State's gang expert, are commonly used by the Goodfellas, including "whoa," "2love," "mobbing," and "omerta." In December 2015, Tucker posted a photo captioned "Don Haiti"; his account name on both Instagram and Facebook is "Capo

---

[4] The State's gang expert testified that the colored bandanas seen in these photographs are called "flags" in a gang.

Haiti."[5] At trial, evidence was presented that Goodfellas members can improve their rank within the gang by "putting in work," which means "committing crimes to build a name for yourself." One way to do this is "by harming a snitch," or someone who is "telling specific information about a crime."

1.    Tucker maintains that the evidence is not sufficient to support his convictions because neither Guffie nor Dukes identified him as the shooter and because the evidence showed that he was elsewhere when the crimes were committed. When considering the constitutional sufficiency of the evidence, we ask whether any rational trial of fact could find beyond a reasonable doubt from the evidence adduced at trial that the defendant is guilty of the crimes of which he was convicted. *Wilkerson v. State*, 307 Ga. 574, 574-75 (837 SE2d 300) (2019). With respect to Tucker's alibi defense, the State bore the burden of proving beyond a reasonable doubt that Tucker was present at the scene of the crimes. See *Bridges v. State*,

---

[5] The State's gang expert testified that Goodfellas use a ranking system "like the mob or the mafia." They designate members as "godfathers," "popes," "capos," "dons," "hitters," and "foot soldiers," in that hierarchical order.

12

268 Ga. 700, 705 (2) (e) (492 SE2d 877) (1997) ("We also find that, with regard to Bridges' alibi defense, the trial court correctly charged that the State bore the burden of proving beyond a reasonable doubt that Bridges was present at the scene of the crime."), overruled on other grounds by *State v. Lane*, 308 Ga. 10, 24 (838 SE2d 808) (2020).

Although Guffie and Dukes did not identify Tucker as the shooter, Mayer testified that Tucker was the person who knocked on the door on the day of the shooting about a minute and a half before he heard gunshots and also identified Tucker as the person who had been looking for the house on the day before the shooting. Banks likewise identified Tucker as the person who had been looking for Lowe on the day before the shooting. Also, evidence was presented about the content of text messages sent by Tucker after the murder that said that Tucker had shot three people and one of them was killed.

Although Tucker presented an alibi defense at trial, testifying that he was at a recording studio at the time of Lowe's murder,

13

evidence was also presented that undercut Tucker's alibi. Evidence was presented that Tucker may have had multiple phones he was using around the time of the shooting and that several people may have had access to those phones. The State presented testimony that the cell tower records do not indicate who was in possession of the phone at the time and that Tucker could have left one of his phones behind at the recording studio.

"[I]t is the role of the jury to resolve conflicts in the evidence and to determine the credibility of the witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." *Stroud v. State*, 318 Ga. 744, 750 (2) (900 SE2d 619) (2024) (citation and punctuation omitted). The jury was authorized to disbelieve Middlebrooks's and Tucker's testimony and instead credit Banks's and Mayer's identifications of Tucker and "rely on that testimony as well as the other evidence of [Tucker's] guilt." *Hinton v. State*, 312 Ga. 258, 261 (1) (b) (862 SE2d 320) (2021). Accordingly, we conclude that the evidence was sufficient for a rational jury to reject Tucker's alibi defense and to instead find

14

beyond a reasonable doubt that Tucker was the one who shot Lowe and his friends.[6]

2. Tucker also asserts that the trial court erred when it permitted the State to introduce evidence about the content of text messages allegedly sent from Tucker to Shameka when the text messages were not admitted into evidence, in violation of the best evidence rule. See OCGA § 24-10-1002.

---

[6] Tucker also asserts without reference to the record or analysis that the evidence was insufficient to support the Gang Act count, which alleged that Tucker "unlawfully, while associated with a criminal street gang, participate[d] in criminal gang activity through commission of at least one of the following offenses . . . : Murder and Aggravated Assault with a Deadly Weapon." To establish that a defendant violated the Gang Act, the State must prove four elements:

(1) the existence of a criminal street gang defined in OCGA § 16-15-3 (2) as any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity;
(2) the defendant's association with the gang;
(3) that the defendant committed one of the offenses identified in OCGA § 16-15-3 (1); and
(4) that the crime was intended to further the interests of the gang.

*Boyd v. State*, 306 Ga. 204, 208 (1) (b) (830 SE2d 160) (2019) (cleaned up). Pretermitting whether this argument has been abandoned, based on our review of the record, we conclude that the evidence was sufficient for a rational jury to conclude that Tucker was a member of the Goodfellas gang and that he shot Lowe and others to prevent Lowe and Mayer from testifying against gang members and to enhance his status within the gang.

Tucker acknowledges that his trial counsel did not object to the admission of this evidence at trial, so we review this claim for plain error only. See *Washington v. State*, 312 Ga. 495, 498 (1) (863 SE2d 109) (2021) (plain error review is available under OCGA § 24-1-103 (d) for unpreserved challenges to evidentiary rulings). To establish plain error, Tucker must meet each prong of a four-prong test:

> First, there must be an error or defect – some sort of deviation from a legal rule – that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by [Tucker]. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected [Tucker's] substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error – discretion which ought to be exercised if only the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

Id. (cleaned up).

The trial court did not commit a "clear or obvious" legal error when it allowed the State to introduce evidence about the content of the alleged text messages between Tucker and Shameka. The best evidence rule provides that, "[t]o prove the contents of a writing,

16

recording, or photograph, the original writing, recording, or photograph shall be required." OCGA § 24-10-1002. An exception to this rule, however, is found in OCGA § 24-10-1004 (1): "The original shall not be required and other evidence of the contents of a writing, recording, or photograph shall be admissible if . . . [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith[.]"

On December 31, 2014, Shameka told Detective Benton that she had lost her cell phone before Benton had the chance to see the text messages in question, and both testified to such at trial. The State was also unable to access Tucker's iPhone to obtain the messages from his end.[7] The State, therefore, showed that the original text messages were lost, and no evidence was presented that Shameka's phone or the text messages were destroyed by the State in bad faith. Tucker has failed to show error, much less plain error, in admitting evidence about the content of the text messages under

---

[7] Tucker testified that he obtained the iPhone the Christmas after Lowe's shooting. Investigators were still interested in accessing the iPhone because it is possible to access information from a prior phone based on backed up data.

17

OCGA § 24-10-1004 (1). Compare *U.S. v. Ross*, 33 F3d 1507, 1513-14 (II) (A) (11th Cir. 1994) (all of Federal Rule 1004's requirements were met because the prosecution was not at fault for the absence of the cassette tapes – which had been destroyed as part of routine procedure – and the transcripts constituted admissible best evidence because the transcripts were evidence of the contents of the misplaced or destroyed audiotapes) with *Benjamin v. Thomas*, 766 Fed. Appx. 834 837-38 (III) (A) (11th Cir. 2019) (proponent of evidence had neither introduced the purportedly unaltered video into evidence nor explained its absence such that her testimony about its contents could be admitted under either Federal Rule 1002 or 1004).[8] See also *Jones v. State*, 345 Ga. App. 14, 15-16 (1) (812 SE2d 337) (2018) (admission of log sheets did not violate best evidence rule where original printouts could not be located even after the investigator conducted a multi-source search and the defendant had not pointed to any evidence in the record suggesting

---

[8] Because OCGA §§ 24-10-1002 and 24-10-1004 (1) are materially identical to the corresponding Federal Rules of Evidence, "we look to federal case law." *State v. Almanza*, 304 Ga. 553, 556 (2) (820 SE2d 1) (2018).

18

any bad faith on the part of the State in connection with the missing documents).

3. Tucker also asserts that the trial court committed plain error by failing to sua sponte charge on justification based on self-defense and the doctrine of reasonable beliefs because there was evidence that Tucker shot Lowe because he had heard that Lowe planned to rob him, so Tucker preemptively shot him. Because Tucker did not request this charge in the trial court, we apply plain error review. See *Jiles v. State*, --- Ga. ---, --- (1) (910 SE2d 159) (2024) (plain error review on appeal when defendant did not object to the omission of a jury instruction at trial).

We conclude that the trial court did not err in failing to give this charge because there was not slight evidence to support a charge on justification. See *Munn v. State*, 313 Ga. 716, 722-23 (3) (873 SE2d 166) (2022) ("To authorize a jury charge [on justification], there must be slight evidence supporting the charge."). OCGA § 16-3-21 (a) provides that "[a] person is justified in threatening or using force against another when and to the extent that he or she

reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's *imminent* use of unlawful force." (emphasis supplied).

Tucker has pointed to no evidence that shooting the victims was necessary to defend himself or any third person from any imminent use of unlawful force. Tucker claims only that, because he had heard that Lowe and his friends were planning to commit an armed robbery against him, he was justified in going to Lowe's house to attack first. This does not reflect "imminent" danger. Thus, there is not slight evidence that Tucker was in any imminent danger to support the giving of a justification charge. See *Williams v. State*, --- Ga. ---, --- (2) (a) (--- SE2d ---) (2024) (defendant was not in imminent danger where victim "did not do anything towards" defendant while she was holding the gun and there was no evidence that the victim was armed that evening or that defendant was "otherwise in immediate danger from [the victim] at the time of the shooting").

Because Tucker has failed to point to even slight evidence that

he reasonably believed at the time of the shooting that force was necessary to defend himself against the victims' imminent use of unlawful force, the trial court did not commit a clear or obvious error in omitting a jury charge on justification. See *Garner v. State*, 303 Ga. 788, 790-91 (2) (815 SE2d 36) (2018) (where defendant pointed to no evidence that supported a reasonable belief that shooting the victim was necessary to defend himself or his girlfriend from any imminent use of unlawful force, that he was in fear of suffering harm during the encounter with the victim, or that the victim was reaching for a weapon, there was "not even slight evidence to support an instruction on self-defense[,]" so the trial court did not err in refusing to charge on that issue).

4. Tucker argues that the trial court plainly erred in defining aggravated assault under OCGA § 16-5-20 (a) (2)[9] instead of OCGA § 16-5-20 (a) (1)[10] as the evidence did not support – and the

---

[9] OCGA § 16-5-20 (a) (2) provides that a person commits an assault when he or she "[c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury."

[10] OCGA § 16-5-20 (a) (1) provides that a person commits an assault when he or she "[a]ttempts to commit a violent injury to the person of another."

21

indictment did not allege – that type of aggravated assault.[11] He contends that the jury should have been instructed that, to be guilty of aggravated assault, Tucker must have "[a]ttempt[ed] to commit a violent injury." But the trial court instead instructed the jury that, "[i]t is only necessary that the evidence show beyond a reasonable doubt that the defendant committed an act that placed the alleged victim in reasonable fear of immediately receiving a violent injury while using a deadly weapon."

Plain error review applies to this enumeration because Tucker did not raise the error at the trial court level. See *Gude v. State*, 320 Ga. 308, 311 (1) (908 SE2d 620) (2024) (challenge to jury instruction on aggravated assault that was not objected to at trial will be reviewed for plain error only).

Assuming without deciding that the trial court committed clear and obvious error in instructing the jury on a method of aggravated

---

[11] The indictment alleged that Tucker "on the 16th day of November, 2014, did unlawfully commit an assault upon" Dukes, Guffie, and Lowe (Counts 4, 5, and 6, respectively), "by shooting [each] with a handgun, the same being a deadly weapon[.]"

assault not charged in the indictment, Tucker has not met his burden of showing that the error likely affected the outcome of the proceedings. As we have repeatedly held, "charging the jury on a method of committing a crime not charged in the indictment does not likely affect the outcome of the proceedings when the jury is also instructed – as it was here – that the burden of proof rests upon the State to prove every material allegation of the indictment and every essential element of the crime charged beyond a reasonable doubt" and is provided with a copy of the indictment during deliberations. See *Jiles*, --- Ga. at --- (2) (d) (quoting *Gude*, 320 Ga. at 311 (1)) (cleaned up).

Also, the jury found Tucker guilty of felony murder predicated on aggravated assault, which necessarily required a finding that Tucker killed Lowe by shooting him, and "there was virtually no chance that the jury based that finding on an intent to merely place him in fear of being shot, rather than an intent to shoot him." *Jiles*, --- Ga. at --- (2) (d) (citation and punctuation omitted). See also *Cato v. State*, 304 Ga. 496, 499 (2) (820 SE2d 41) (2018) (concluding no

likelihood that the jury, in convicting the defendant of murder, did so on the basis that the aggravated assaults "merely put the victims in reasonable apprehension of immediately receiving a violent injury"). Tucker therefore has not shown that the charging error likely affected the outcome of the proceedings. Accordingly, Tucker has not shown plain error warranting reversal, and this enumeration of error fails.

5. Tucker next contends that the trial court erred in admitting irrelevant and prejudicial evidence from his phone and social media accounts. During opening statements, Tucker objected to the State displaying photographs of Tucker with guns – taken from his LG phone – to the jury and moved for a mistrial, which the trial court denied. Later, Tucker again objected to the admission of several photographs and videos taken from the cell phone, arguing that the evidence was irrelevant, prejudicial, lacked any probative value, and the prejudicial effect substantially outweighed its probative value. As to the video recordings taken from Tucker's cell phone, Tucker argued that they were not relevant because they did not show when

the videos were recorded.

The trial court overruled most of these objections, admitting voluminous evidence in the form of photographs, messages, and videos at trial and allowed witnesses to testify about this evidence. Specifically, the trial court held that, under OCGA § 24-4-403 ("Rule 403"),[12] posts and photographs from Tucker's social media pages that showed Tucker's "continued affiliation and promotion within the gang," like those displaying Goodfellas-specific gang symbols or captioned with words and phrases commonly used by the Goodfellas gang, such as "capo," "don," "omerta crew," "whoa," "2love," and "GFIP"[13] were probative of at least his gang activity. But the court excluded others that were "simply showing things like weapons displayed, [and unidentifiable] gang signs." The court also limited the admissible social media evidence to a period close in time to

---

[12] OCGA § 24-4-403 provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[13] The State's gang expert testified that "GFIP" is a gang-specific abbreviation for "Goodfella in peace," which is often used in place of "rest in peace."

Lowe's death. For example, some of Tucker's Facebook posts relating to the time periods leading up to and immediately following the events alleged were admitted. Similarly, Tucker's gang-related Instagram posts made between 2016 and 2017 were admitted, but those from two and a half to three years after Lowe's death were not. The court specifically found for each of the admitted items that their probative value was not substantially outweighed by the risk of unfair prejudice.

Given Tucker's objections at trial, we review the trial court's rulings on the admission of evidence for an abuse of discretion. *McGarity v. State*, 311 Ga. 158, 163 (2) (856 SE2d 241) (2021). Some of the State's exhibits showed Tucker making gang signs, showed him engaged in other gang activity, or were accompanied by testimony indicating that Tucker was involved in a gang. These were clearly relevant to prove the Gang Act count and were not unduly prejudicial even if they showed Tucker with guns. See OCGA § 16-15-3 (3) (providing that existence of a street gang "may be established by evidence of a common name or common identifying

signs, symbols, tattoos, graffiti, or attire or other distinguishing characteristics"); *Butler v. State*, 310 Ga. 892, 898 (2) (855 (SE2d 551) (2021) (admitted evidence of gang participation and other gang-related testimony was not unfairly prejudicial and was "highly probative [and] indeed necessary to prove several essential elements of the Street Gang Act offense – the existence of the gang, [defendant's] participation therein, and the nexus between the crimes and the gang's interest"); *Lupoe v. State*, 300 Ga. 233, 248 (13) (794 SE2d 67) (2016) ("Because the photographs depicted, among other things, the type of signs, symbols, and clothing worn by the [ ] gang, which the State had the burden to prove, the photographs were admissible.").

Other photographs and videos depicted Tucker holding guns but did not show gang signs or any other indication of gang affiliation. However, the State presented testimony from an investigator who was an expert in criminal street gangs and criminal street gang activity. The investigator compared the .45-caliber Hi-Point pistol that was used in the shooting to videos and

photographs of Tucker with a firearm, pulled from Tucker's phone. She testified that the firearm in the photographs and videos had "the same shape" as the Hi-Point pistol, "looks like it's the same" and was "made exactly like this gun," though she could not "say for certain" that it was the same gun. Because the State presented evidence that the guns depicted in the photographs and videos of Tucker were similar to the one used in the shooting, the images admitted at trial were relevant to show that Tucker had access to a gun similar to one used in the shooting and were not unduly prejudicial. See *Harris v. State*, 313 Ga. 225, 232-33 (4) (869 SE2d 461) (2022) (photograph from Facebook depicting defendant with a firearm and messages from defendant claiming to own it were relevant because they were sent ten days before the victim's murder and the gun pictured was "one of the types of guns that the State's expert testified could have fired the .40-caliber rounds found after the shootings").

As for Tucker's claim that the video recordings lacked foundation, we acknowledge that, at trial, the State did not explicitly establish the date that the videos from Tucker's phone extraction

28

were created. However, the extraction reports from Tucker's cell phone – that the State admitted into evidence – provide creation dates for both videos. The first video, which depicts several firearms, was created on December 12, 2014. The second video, which shows Tucker holding a firearm and pointing it at the camera, was created on January 7, 2015. The shooting took place on November 16, 2014, so both videos were taken in the following two months. As described above, the gang expert at trial used these videos to compare the .45-caliber Hi-Point pistol to the firearm used in the shootings and found that they were similar, so the videos are relevant and probative to show that Tucker had access to a gun similar to the one used in the shootings. For these reasons, we conclude that the trial court did not abuse its discretion by allowing this evidence to come in or by allowing witnesses to testify about it.

As for some of the videos and photographs pulled from Tucker's phone and social media accounts that displayed Tucker with other firearms, the admission of this evidence, even assuming it was not relevant, constituted harmless error. "The test for determining

nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Cook v. State*, 312 Ga. 299, 302 (2) (862 SE2d 510) (2021) (citation and punctuation omitted). The evidence against Tucker was strong. Banks identified Tucker as the person who had come to her door looking for Lowe on the day before the shooting. Mayer identified Tucker as the person who knocked on the door shortly before the shooting began and who was seen running away. There was also testimony regarding the text messages from Tucker about shooting three people and killing one of them. See *Lofton v. State*, 309 Ga. 349, 357 (3) (b) (846 SE2d 57) (2020) (admission of photographs showing defendant with handguns was harmless in part because the State "presented strong independent evidence of Appellant's guilt"). Even assuming it was an abuse of discretion to admit these images, it is unlikely that any error contributed to the verdict, given the other substantial evidence of Tucker's guilt and the cumulative nature of these photographs. See *Young v. State*, 309 Ga. 529, 538 (3) (847 SE2d 347) (2020) (concluding that any harmful effect of a photograph of the defendant

30

with a gun "was diminished because it was cumulative of other properly admitted evidence, which included evidence pertaining to other pictures of [the defendant] with guns").

6. Though not enumerated in Tucker's brief, the State has pointed out an error with respect to the trial court's sentencing of Tucker.[14] During sentencing, the prosecutor recommended that the court merge the aggravated assault on Lowe (Count 6) into the felony murder conviction (Count 2) and sentence Tucker on the aggravated assaults of Dukes and Guffie (Counts 4 and 5). In providing the count numbers, however, the prosecutor misspoke and said that the aggravated assault charge on Lowe was Count 4, when in fact, it was Count 6. The trial court thereafter merged the sentence on Dukes's aggravated assault with the felony murder of Lowe and sentenced Tucker for the felony murder and aggravated

---

[14] We have the discretion to correct a merger error on our own initiative and have chosen to exercise "that discretion in cases in which the error harms the defendant—cases in which the trial court erroneously convicted and sentenced a defendant for a crime that ought to have been merged, resulting in a conviction and sentence that were not legally authorized." *Dixon v. State*, 302 Ga. 691, 696-97 (4) (808 SE2d 696) (2017).

assault of Lowe.

Because Tucker should not have been sentenced on the aggravated assault of Lowe (Count 6) when he was also convicted and sentenced for the felony murder of Lowe, we vacate the sentence on Count 6. See *Steele v. State*, 317 Ga. 411, 414 (2) (893 SE2d 721) (2023) ("When the only murder conviction is for felony murder and a defendant is convicted of both felony murder and the predicate felony of the felony murder charge, the conviction for the predicate felony merges into the felony murder conviction." (citation and punctuation omitted)). In addition, because Count 4 should not have been merged, we remand for resentencing on that count. See *Smith v. State*, 301 Ga. 79, 80-81 (2) (799 SE2d 762) (2017) (case remanded for resentencing where the trial court correctly announced at sentencing that it would merge the aggravated assault count into the malice murder count and sentence the defendant for possession of a firearm during the commission of a felony, but in the final disposition sheet merged the possession of a firearm during the commission of a felony count and sentenced on the aggravated

assault count instead).[15]

*Judgment affirmed in part and vacated in part, and case remanded for resentencing. All the Justices concur.*

---

[15] We recognize that this error benefitted Tucker and that we have generally chosen not to exercise our discretion to correct sentencing errors that benefit the defendant when the State has not raised it in a cross-appeal. See *Dixon*, 302 Ga. at 698 (4) ("[W]hen a merger error benefits a defendant and the State fails to raise it by cross-appeal, we . . . will exercise our discretion to correct the error upon our own initiative only in exceptional circumstances."). However, under the unique circumstances of this case, it is clear from the record that the trial court intended to sentence Tucker for the aggravated assault on Dukes and would have done so but for mixing up the count numbers. To correct the error in failing to merge the aggravated assault of Lowe and to allow the merger of the aggravated assault on Dukes to stand would provide a windfall to Tucker. For this reason, we choose to exercise our discretion in this case to remand for resentencing on Count 4.